Donald A. LOCK, Roosevelt Washington and Bruce E. Carpenter, Individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Leo D. JENKINS, Individually and as Warden of the Indiana State Prison, Jack R. Duckworth, Individually and as Assistant Warden of the Indiana State Prison, Charles F. Adkins, Individually and as Director of Classification at the Indiana State Prison, G. D. Wilkins, Individually and as Custody Supervisor at the Indiana State Prison, Captain Parks, Individually and as a Captain at the Indiana State Prison, Captain Koziatek, Individually and as a Captain at the Indiana State Prison, Captain Hoover, Individually and as a Captain at the Indiana State Prison, Robert P. Heyne, Individually and as Commissioner of Correction of the State of Indiana, Cloid L. Shuler, Individually and as Executive Director of Adult Authority for the Indiana Department of Correction, William Nardini, Therese-Marie Razzini, John W. White, Ronald H. Hull, J. David Baker, Arthur P. Coblentz and William D. Bontrager, Individually and as members of the Board of Correction of the State of Indiana, Defendants.

No. S 75–141.

United States District Court, N. D. Indiana, South Bend Division.

Dec. 27, 1978.

Myrna Hart, Valparaiso, Ind., for plaintiffs.

Theodore L. Sendak, Atty. Gen. of State of Ind., Indianapolis, Ind., for defendants.

## MEMORANDUM OPINION

ALLEN SHARP, District Judge.

This will serve to explain the legal basis for the separately entered findings of fact and conclusions of law entered here.

The complaint, as amended, asserts a claim under 42 U.S.C. § 1983 for damages and injunctive relief for certain named pretrial detainees held in custody at the Indiana State Prison. The case was tried on the merits to the Court at the Indiana State Prison on November 1 and November 2, 1978.

### I.

This is an action brought by former pretrial detainees who were housed at the Indiana State Prison, Michigan City, Indiana pursuant to IC 1971, 35–2.1–1–1. They purport to represent a class consisting of all pretrial detainees who are housed at the Indiana State Prison pursuant to IC 1971, 35–2.1–1–1. The issue is whether the conditions of their confinement are violative of the constitution.

This action was filed *pro se* by Donald A. Lock on August 12, 1975. A second amended complaint was filed on December 23, 1975 with the assistance of retained counsel. The second amended complaint included Bruce Carpenter and Roosevelt Washington as party plaintiffs. The named defendants include Leo D. Jenkins, Warden; Jack R. Duckworth, Assistant Warden; Charles F. Adkins, Director of Classification; G. D. Wilkins, Custody Supervisor; Captain Parks; Captain Koziatek; Captain Hoover; Robert P. Heyne, Commissioner of the Indiana Department of Correction; Cloid Shuler, Executive Director of Adult Authority for the Indiana Department of Correction;

and William Nardini, Therese-Marie Razzini, John W. White, Ronald H. Hull, J. David Baker, Arthur P. Coblentz and William D. Bontrager, members of the Indiana Board of Correction.

The Indiana State Prison is a maximum security institution for the incarceration of adult male felons. Approximately 1600 persons are currently incarcerated at the Prison.

Pretrial detainees are sent to the Prison pursuant to IC 1971, 35–2.1–1–1. They are sent to the prison for medical reasons, or because they are a high security risk, or because they are a management problem, or because of any other emergency situation. The Prison retains custody of the pretrial detainee until further order of the committing court. The committing court does not send any pertinent information about the pretrial detainee. To solicit this necessary information prison officials developed liaisons with the committing authorities.

Pretrial detainees sent to the Prison for medical reasons are housed in the hospital. Unless the committing court specified differently, all other pretrial detainees are housed in the Admissions and Orientation Unit. This is done because the committing authority provides no background information thus it is safer to isolate them from the general prison population and that unit is the best possible place consistent with good safety and security not only for the detainee but for convicted inmates and staff. The Admissions and Orientation unit is the least restrictive unit to house pretrial detainees considering their special status as non-convicted persons, their small aggregate number, the indefinite amount of time housed at the Prison, the fact that they are high security risks, the management and discipline problems which require special security considerations to assure their presence at trial and the fact that it provides the maximum amount of security for pretrial detainees. Pretrial detainees are only placed in general population pursuant to court order and with their own consent.

## II.  CLASS

Before the trial this Court conditionally certified under Rule 23(b)(2) a class of these pretrial detainees held at the Indiana State Prison during the pendency of this case to the present. At the time of the trial there were seven such pretrial detainees, of which three were in the prison hospital, three were in general prison population (at their own request) and one was confined in the Admission and Orientation (A & O) Unit at the prison. With the exception here noted that class determination is finally certified. Excepted therefrom are those pretrial detainees who are or were voluntarily located in the general population of the prison during the pendency of this case. On the basis of the posture taken here, both implicit and explicit, these plaintiffs do not now purport to represent pretrial detainees who are or have been voluntarily located in the general population of the prison.

## III.  INDIANA'S SAFE-KEEPING OF PRISONERS ACT

Indiana's original Safe-keeping of Prisoners Act was enacted by Acts 1937, ch. 157, §§ 1, 2 and 3, p. 841 as follows:

"Section 1. Be it enacted by the general assembly of the State of Indiana, That while a prisoner is being held in custody awaiting trial, during trial or following trial, the court having jurisdiction shall make, from time to time, such orders for the safe-keeping of the prisoner as the court shall consider to be necessary. The court, of its own motion, or on written motion of the prosecuting attorney, or of the prisoner or his attorney, or of the attorney general of the state, may order any sheriff, police officer, or other official having custody of the prisoner to retain such custody in his respective jail until further order of the court, or to deliver such custody to some other sheriff or qualified officer, to hold such prisoner as ordered in his respective jail until further order of the court, or, in case the court finds that an emergency exists, the court may order such sheriff or other officer to deliver such custody to the

warden or superintendent of a designated penal or correctional institution of the state to hold such prisoner as ordered in his institution until further order of the court. The court shall conduct a public hearing on such written motion when filed by the prosecuting attorney, by the prisoner, or by the attorney general, if such applicant requests such hearing. At such hearing, such written motion shall be prima facie sufficient evidence of the necessity for the disposition of the custody of the prisoner as requested in such motion, and the burden of proving that such disposition is not necessary for the safe-keeping of such prisoner shall be sustained by any objecting party in interest, or official, or other interested person who is opposed to the granting of such motion. At any time, the court having jurisdiction, of its own motion, may require a guard or guards to be posted to protect the custody of a prisoner pending, during and after trial. The selection, appointment and compensation of such guards and the discharge of their duties shall be provided for by the order of the court. In making such order, the court either may select as such guard or guards experienced and trustworthy police officers, or it may request that the superintendent of the Indiana state police shall supply adequate guards, if the superintendent has such guards available, without cost to the county. It is hereby made the official duty of all sheriffs, wardens, superintendents, police officers, and other officials of this state, and of each city or other governmental unit or division of this state, and each of them is hereby empowered, to obey the commitments or other orders which the court may issue from time to time in regard to the custody of such prisoner. Whenever the presence of the prisoner may be required in preparation for trial or for the trial, in the court having jurisdiction of the trial of the case, such court, or the court granting removal of the cause if it has retained control of the custody of the prisoner prior to trial, shall order the prisoner to be produced in court as required. The court of trial shall have control of the custody of the prisoner during and after trial. The costs and expenses of such safekeeping shall be paid by the county for which the prisoner is being held in custody, upon order of the court thereof, except for guard duty by the Indiana state police, as provided in this act. The duties herein imposed upon the court shall be discharged by the judge thereof in vacation, or by the clerk thereof in the absence of the judge.

Sec. 2. This act shall be known and may be cited as the Safe-keeping of Prisoners Act.

Sec. 3. All laws and parts of laws in conflict herewith are hereby repealed, and section 11 of an act entitled 'An act concerning county prisons,' approved May 27, 1852, and section 141 of an act entitled 'An act concerning public offenses,' approved March 10, 1905, and all acts amendatory thereof, are hereby specifically repealed."

It eventually became known as Burns' Ind. Stat.Anno. §§ 9–1046 and 9–1047 (1956 Repl.), and codified in the new Indiana Code as IC 1971, 35–4–7–1 and 2.

The Indiana General Assembly added a new article to Title 35 which contained the identical language of § 9–1046; Acts 1973, P.L. 325, § 2, p. 1750, codified as IC 1971, 35–2.1–1–1. The compiler's notes in Burns' Ind.Stat.Anno.Code Edition stated that Acts 1937, ch. 157, §§ 1, 2, p. 841 was deemed superseded by IC 1971, 35–2.1–1–1.

Acts 1975, P.L. 328, § 1, p. 1779 was enacted to amend IC 1971, 35–2.1–1–1 by deleting the following language:

". . . designated penal or correctional institution of the state to held such prisoner as ordered in his institution until further order of the court."

and inserting the following language:

". . . state penal or correctional institution designated by the Indiana department of correction for that purpose, the department to retain custody of the prisoner until further order of the court."

In light of the fact that Indiana had two statutes exactly alike, the latter superseding the former, the Indiana Legislature repealed IC 1971, 35–4–7–1 and 2 by Acts 1976, P.C. 148, § 24 which became effective on July 1, 1977. However, the effectiveness of that repeal was delayed until October 1, 1977 by Acts 1977, P.L. 340, § 151. Thus the current Safe-keeping of Prisoners Act in Indiana is found at IC 1971, 35–2.1–1–1 (as amended).

The statute provides only that the Department of Correction is to have custody of safekeepers. It is silent on how that custody is to be afforded.

Under this statute the Warden of the Indiana State Prison has less than full responsibility for such pretrial detainees or safekeepers. The scope of his responsibility is more limited than that of regularly confined prisoners. The Court having jurisdiction over the pretrial detainees' pending case plays a vital legal role in the circumstances of such pretrial confinement. For example, a pretrial detainee may request to be placed in the general prison population but the judge of his pending case *must* concur before the Warden can grant such a request.

The information which the Warden often receives upon the arrival of a pretrial detainee is often sparse. In contrast the Warden must have a copy of an extensive presentence report when receiving a regular inmate commitment.

Generally, pretrial detainees are sent to the Indiana State Prison by various state courts for one of two reasons, either as security risks to themselves or others or for medical treatment. In the case of the plaintiff Washington, he was confined for medical reasons. The plaintiff Carpenter had escaped from the DeKalb County Jail and considerably later located in California living under an assumed name. His jail escape from the DeKalb County Jail followed only two days of confinement. The initial reason for Lock's confinement at the prison was medical although he later threatened escape.

## IV.

"Upon the whole, if the offense be not bailable or the party cannot find bail, he is to be committed to the county gaol . . . there to abide till delivery by due course of law . . . But his imprisonment, as has been said, is only for safe custody, and not for punishment: Therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only." 4 Blackstone Commentaries 300.

An appropriate and recent statement of Mr. Justice Powell in *Procunier v. Martinez* provides a proper backdrop for the decision of this case:

"Traditionally, federal courts have adopted a broad hands-off attitude towards problem of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary preceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison

administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." (Footnotes omitted). *Procunier v. Martinez*, 416 U.S. 396 at 404–05, 94 S.Ct. 1800 at 1807, 40 L.Ed.2d 224 (1974).

By basic definition, any pretrial detainee assigned by a state judge to the Indiana State Prison must be presumed to have special problems or pose special risks. Otherwise, the prisoner would remain in the local jail or other confinement facilities. Therefore, the factual setting of this case is substantially different than that found in *Duran v. Elrod*, 542 F.2d 998 (7th Cir. 1976); *Smith v. Shimp*, 562 F.2d 423 (7th Cir. 1977); *Rhem v. Malcolm*, 371 F.Supp. 594 (S.D.N.Y.1974), supplemented 377 F.Supp. 995, 389 F.Supp. 964, 396 F.Supp. 1195, affirmed in part and remanded 507 F.2d 333, affirmed 527 F.2d 1041 (2d Cir. 1976); *Inmates of Milwaukee County Jail v. Peterson*, 353 F.Supp. 1157 (D.C.Wis.1973); *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 421 F.Supp. 832 (E.D.N.Y. 1976); *Taylor v. Sterret*, 532 F.2d 462 (5th Cir. 1976); *Hamilton v. Love*, 328 F.Supp. 1182 (E.D.Ark.1971); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973), affirmed 494 F.2d 1196 (1st Cir. 1974), cert. den. 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189; *Brenneman v. Madigan*, 343 F.Supp. 128 (N.D.Cal.1972); *Miller v. Carson*, 401 F.Supp. 835 (M.D.Fla.1975); and *Campbell v. McGruder*, 416 F.Supp. 106 (D.C.D.C.1975); and *Kersh v. Bounds*, 501 F.2d 585 (4th Cir. 1974).

The last word from our Court of Appeals is highly relevant here. In *Bijeol v. Nelson*, 579 F.2d 423 (7th Cir. 1978), the court said:

"By the very nature of confinement, restrictions do occur. This has been recognized with respect to convicted prisoners. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Those cases have also been applied to pretrial detainees, *Padgett v. Stein*, 406 F.Supp. 287 (M.D.Pa.1975). As was recognized in *Butler v. Crumlish*, 229 F.Supp. 565, 566 (E.D.Pa.1964):

'[P]ending trial . . . a defendant may be imprisoned in a cell and must submit to the routine of the prison relating to his meals, his exercise and the many other activities of daily life. All these matters, however, are incidental elements in the organized caretaking of the general company of prisoners.' "

The factual context of *Epps v. Levine*, 457 F.Supp. 561 (D.Md.1978), is more similar to this case than most.

To be sure the rights of pretrial detainees which have been exhaustively discussed in the above cases are relevant to a proper determination of this case even though the factual setting is somewhat different.

■ It is clear that the Constitution's proscription on cruel and unusual punishment applies against conditions maintained in state correctional facilities. It is equally clear that a state correctional official cannot deny due process of law or equal protection of the laws. The Constitution proscribes those practices and conditions that are barbarous or shocking to the general conscience. *LaBatt v. Twomey*, 513 F.2d 641, 648 (7th Cir. 1975). However, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). That principle was recently reaffirmed by the Supreme Court in *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977). While the Federal courts will intervene to protect clearly established constitutional rights, *Little v. Walker*, 552 F.2d 193 (7th Cir. 1977), prison authorities must be given great latitude in the administration of the facility committed to their care. See also, *Ahrens v. Thomas*, 570 F.2d 286, 289–90 (8th Cir. 1978).

■ The resort to and intervention by federal courts must be limited to correction of conditions that violate clearly established constitutional rights. Federal courts should defer to corrections officials as to the means by which rights are effectuated. *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). This is so because ". . . the problems of prisoners in America are complex and intractable, and . . . they are not readily susceptible of resolution by decree." *Procunier v. Martinez, supra*, 416 U.S. at 404–405, 94 S.Ct. at 1807. There are many competing philosophies and theories of corrections, and the courts are

"not to exercise judicial power for the attainment of what [judges] as individuals might like to see accomplished in the way of ideal prison conditions. There are those who would argue that imprisonment in any form is cruel and unusual." *Newman v. Alabama*, 559 F.2d 283 (5th Cir., 1977), cert. denied 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).

■ A detainee may not be deprived of the rights of other citizens beyond the extent necessary to assure his appearance at trial and the security of the institution to which he is confined. *Rhem v. Malcolm*, 371 F.Supp. 594, 623 (S.D.N.Y.1974). As individuals who have not been convicted of crime, they retain all rights retained by arrestees who have been released on bail, except for the curtailment of mobility deemed necessary to secure attendance at trial and the limitations necessary to protect the security of the institution in which they are detained. *Inmates of Milwaukee County Jail v. Peterson*, 353 F.Supp. 1157, 1160 (E.D.Wis.1973). A pre-trial detainee can only be deprived of the constitutional rights a defendant on bail awaiting trial enjoys to the extent such denial is required to insure that he appears at trial and to restrain him from endangering or disrupting the security of the institution in which he is detained. *Collins v. Schoonfield*, 344 F.Supp. 257, 265 (D.Md.1972). The principle of the least restrictive alternative consistent with the purposes of a commitment inheres in the very nature of a pre-trial

confinement which entails an extraordinary deprivation of liberty justifiable only when the detainee is unable to make bail. *Brenneman v. Madigan*, 343 F.Supp. 128, 138 (N.D.Cal.1972).

The Seventh Circuit in *Duran v. Elrod*, 542 F.2d 998 (1976) states that pre-trial detainees may not be punished at all because they have been convicted of no crime. The sole permissible interest of the state is to ensure their presence at trial. The analysis of suits by pre-trial detainees is based on the due process clause of the Fourteenth Amendment. The Court held that as a matter of due process, pre-trial detainees may suffer no more restrictions than are reasonably necessary to ensure their presence at trial. The state must justify any conditions of their confinement solely on the basis of ensuring their presence at trial. Any restriction or condition that is no; reasonably related to this sole stated purpose of confinement would deprive a detainee of liberty or property without due process, in contravention of the Fourteenth Amendment.

As Judge Coleman suggested in *Newman* we must keep our eye on the fact that these are constitutional claims.

"This does not mean that Constitutional standards are not to be scrupulously observed or that the statutes designed to enforce that objective are to be denied full effect. It does mean in the prison context that federal courts should keep their eyes on the main objective, the Eighth Amendment command for the eradication of cruel and unusual punishment. The remedy must be designed to accomplish that goal, not to exercise judicial power for the attainment of what we as individuals might like to see accomplished in the way of ideal prison conditions. There are those who would argue that imprisonment in any form is cruel and unusual. The Amendment, however, recognizes the right to punish for criminal conduct as long as that punishment does not escalate to the cruel and unusual." *Newman v. Alabama*, 559 F. 283, 287 (5th Cir. 1977).

We should also keep in mind the admonition in *Johnson v. Avery*, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718:

"There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene."

## V. *DAMAGE CLAIMS*

As indicated by the detailed findings entered herewith the damage claims of the plaintiffs fall into several categories:

A. Mail Procedure.
B. Visitation.
C. Telephone procedure.
D. Recreation and exercise.
E. Showers.
F. Access to the Courts.
G. Access to medical services.
H. Discipline.
I. Use of tear gas.
J. Rehabilitation.
K. Loss of property.

The factual contentions as to damages also form the basis for requested injunctive relief.

It is basic and elementary that a considerable part of this court's function in a bench trial on the merits is the determination of questions of credibility and weight. In this case a total of 18 witnesses were called. Implicit in many of the findings of fact are this court's determination of questions of credibility. However, a specific comment is in order in regard to the credibility of the plaintiffs, Lock and Cunningham. The court carefully observed their demeanor and conduct while on the witness stand and has concluded that both are extremely intense men who harbor great hatred. Their personalities appear to have become immersed in this hatred. Their threatening words and attitudes toward some defendants in this case are noted and may well have colored their view of the facts. On the basis of these observations made in open court during this trial, this court entertains serious reservations as to the credibility of these two plaintiffs as witnesses in this case. The importance of this is well illustrated in *U. S. ex rel. John W. Gentry v. The Circuit Court of Cook County et al.*, 586 F.2d 1142 (7th Cir. 1978), following *Townsend v. Sain*, 372 U.S. 293, 322, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

Many of the damage claims center around the incident at the prison on October 11, 1975 when an escape was effected from one of the units where detainees are confined. It is certainly inferable from the evidence that the plaintiffs Lock and Cunningham had prior knowledge of said escape plan. The escapees were armed, fired at least one shot at a female employee of the prison and held the Warden, Leo Jenkins, hostage for a time. It was described by several longtime prison employees as one of the worst, if not the worst emergency, in their experience. The statement of Judge Grant in *Aikens v. Lash*, 371 F.Supp. 482, 492 (D.C.1974), is highly relevant here:

"It should be crystal clear, however, that the determination of the institution-wide emergency situation is one which calls into play the informed expertise of the Superintendent or Warden. Courts cannot and should not 'second guess' Wardens on this score."

October 11, 1975 was a classical institution-wide emergency. This Court will not "second guess" the response to it. No Eighth Amendment violations occurred and there were no incidents of "unprovoked assault" as defined by Judge Friendly in *Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1975).

In each of the incidents of personal injury and loss of property this Court fails to find the kind of intentional, malicious, wilful or deliberately indifferent conduct which shocks the conscience.

The plaintiffs called Anthony S. Kuharich as an expert witness. He was extensively examined and cross-examined by counsel and was questioned by the Court. He is a former Chief Probation Officer of this Court and has a long career in state and federal correctional institutions. For pur-

poses of brevity his full resume of background and qualifications is attached hereto as Appendix A.

He had previously made an examination of the facilities, procedures, personnel and practices. He made several recommendations which he had previously made to the Warden. He expressed the belief that the Warden would carefully consider his suggestions. He was strong in his endorsement of the complete good faith of the Warden and his staff and was emphatic that he found no evidence whatsoever of bad faith. He pointed to a number of improvements that had been made. He was also questioned under Rule 704 of the Federal Rules of Evidence as to constitutional violations which he observed. In his opinion there was only one possible constitutional violation and it concerned time out of cell. Later in the trial the Warden and others detailed their experiences and problems with time out of cell. There are clear reasons of institutional and inmate safety involved in the current practice and the same does not violate the Eighth Amendment.

### A. MAIL

The mail procedure for pre-trial detainees prior to August 1, 1975 was that there was no restriction on incoming and outgoing mail received or sent. He could write to and receive mail from anyone. From August 1, 1975 until the present, pre-trial detainees are privileged to receive and correspond with anyone he so desires. Exceptions to this would require that the committing agency state in writing that he would not be allowed to correspond with a certain person or persons. Postage is provided by the pre-trial detainee or by the committing agency.

Plaintiff failed to show any constitutional infirmity with these procedures. The court is not presented with a situation where prison officials refused to mail any pre-trial detainees letter, as in *Nolan v. Scafati*, 430 F.2d 548 (1st Cir. 1970); or a limitation on the number of correspondents, as in *Lee v. Tahash*, 352 F.2d 970 (8th Cir. 1965); or a

situation of harassment by prison officials in relation to mail, as in *Bach v. People of State of Illinois*, 504 F.2d 1100 (7th Cir. 1974); or a situation of mail censorship, as in *Wilkinson v. Skinner*, 462 F.2d 670 (2nd Cir. 1972); or a situation where detainees' mail is continuously read by prison officials, as in *Vienneau v. Shanks*, 425 F.Supp. 676 (W.D.Wis.1977); or unjustified governmental interference with communications, as in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

The procedures relating to the use of mail by pre-trial detainees comports with the constitutional requisites.

### B. VISITATION

Prior to August 1, 1975 before a pre-trial detainee could have any visitors, the names of the visitors must be approved by the committing agency. The reason for this procedure was prison officials felt that the committing court would have more knowledge concerning who the detainee could or should visit. Pre-trial detainees are sent to the prison for safekeeping by the court who retains control over any privileges granted to that detainee. From August 1, 1975 until the present there are no restrictions placed on a pre-trial detainee's visitation. He may have a visitor every day of the week. All visitation at the prison is contact visitation, which is not constitutionally required. See *Feeley v. Sampson*, 570 F.2d 364 (1st Cir. 1978).

Thus there is no situation as presented in *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 421 F.Supp. 832 (E.D. N.Y.1976); or *Miller v. Carson*, 563 F.2d 741 (5th Cir. 1977); or *Nadeau v. Helgemoe*, 423 F.Supp. 1250 (D.N.H.1976).

For any person to visit with any resident at the prison proper identification must be shown. If the prospective visitor cannot positively identify himself or herself to the Information Desk, visitation would be postponed until positive identification was shown. This restriction is reasonably premised on security at the institution.

None of the named defendants denied any pre-trial detainee the privilege of visitation with family, friends or attorneys of record.

A careful analysis of this problem is found in *White Eagle v. Storie*, 456 F.Supp. 302 (D.Neb.1978).

### C.  TELEPHONE

The telephone procedure for pre-trial detainees is analogous to the visitation procedure.  Prior to August 1, 1975 collect calls were not permitted unless the prison had specific approval from the committing agency.  If approval was received he could call immediate family members and his attorney of record.  From August 1, 1975 until the present a pre-trial detainee may make one collect call per week to his immediate family and attorney of record.

Prison officials expressed legitimate concern with regard to institutional security; and the resultant procedures were reasonable and were not arbitrary or capricious.  None of the named defendants intended to deny a pre-trial detainee of his rights.

### D.  RECREATION AND EXERCISE

In 1975 pre-trial detainees housed in security units were given at least two hours for recreation and exercise at least two or three times per week.  It has been the practice since 1976 to permit daily exercise for pre-trial detainees.  Outdoor recreation is available, weather permitting.  Pre-trial detainees must be allowed reasonable recreation.  *Miller v. Carson*, 563 F.2d 741 (5th Cir. 1977).  It has been held by numerous courts that confinement for long periods of time without the opportunity for regular exercise does as a matter of law constitute cruel and unusual punishment.  *Sinclair v. Henderson*, 331 F.Supp. 1123 (E.D.La.1971); *Smith v. Sullivan*, 553 F.2d 373 (5th Cir. 1977); *Spain v. Procunier*, 408 F.Supp. 534 (N.D.Cal.1976); *Wolfish v. Levi*, 573 F.2d 118 (2d Cir. 1978).  These two hours per day of recreation/exercise opportunity provided to pretrial detainees at the prison, while possibly not ideal, comports with constitutional requisites.

In all of their dealings with affording recreation/exercise opportunities for pretrial detainees, defendants acted reasonably without caprice.  The named defendants never intended to deny pre-trial detainees of the constitutional rights with regard to exercise or recreation.

### E.  SHOWERS

In 1975 pre-trial detainees housed in the security units at the prison were permitted to shower at least two or three times per week.  From 1976 up to the present pre-trial detainees are permitted to shower every day.  Plaintiffs do not claim that this schedule threatens in any way the health of any of the plaintiffs.  It is not, therefore, a barbaric limitation on plaintiffs' need to keep clean.  *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854, 866 (4th Cir. 1975); *McCray v. Sullivan*, 509 F.2d 1332, 1335 (5th Cir.) cert. denied, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 36 (1975) (two showers per week); *Krist v. Smith*, 309 F.Supp. 497 (S.D.Ga.1970), aff'd. 439 F.2d 146 (5th Cir. 1971) (two showers per week).

Pre-trial detainees and convicted men at the prison are permitted the equal opportunity to shower, e. g. every day.  Plaintiffs are afforded access to showers in the maximum amount possible.  Plaintiffs did not claim that the shower schedule for pre-trial detainees at any point in time threatened in any way the health of any of the plaintiffs.

### F.  ACCESS TO THE COURTS

There are no restrictions on incoming and outgoing mail received or sent by pre-trial detainees at the prison.  They could write to and receive mail from anyone.  The only exception to this procedure would be if the committing agency that sent a pre-trial detainee to the prison would prohibit in writing that the pre-trial detainee was not allowed to correspond with a certain person or persons.  Postage was provided by the individual pre-trial detainee or by the committing agency (Plaintiffs' Exhibits 23 and 25).  The visitation procedure for pre-trial

detainees from November 20, 1974 until August 1, 1975 was that visits from relatives, friends or attorneys were allowed if the institution had received written approval from the committing agency. From August 1, 1975 until the present a pre-trial detainee has the same visiting privileges as other inmates, except that the committing agency may alter or restrict in writing a pre-trial detainees visiting list.

The staff at the prison was expected to assist pre-trial detainees in obtaining legal material when requested. Personnel from the prison writ department assisted pre-trial detainees housed in security units with their legal matters. Contact between the writ room personnel and pre-trial detainees was temporarily curtailed in the late spring and summer of 1975 because prison officials had reason to believe that pre-trial detainees were receiving contraband from writ room personnel and an investigation was in progress. This action was reasonable without caprice. The writ department remained accessible by pre-trial detainees through the assistance of custody personnel.

█ Access to the courts is a basic right of every person, including pre-trial detainees, and is a right which

> "prison regulations must not unreasonably invade . . . without some persuasive governmental justification." *Cruz v. Hauck,* 475 F.2d 475, 477–478, (5th Cir. 1973).

*Accord, Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Ex Parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941).

Plaintiffs' class had ample access to the courts either through the use of the mail, visitation with attorneys at the institution, or writ department personnel.

█ Plaintiff Lock raised the complaint of not having a typewriter at all times, alleging this was a constitutional right. The Fifth Circuit in *Tarlton v. Henderson,* 467 F.2d 200 (1972) perceived no constitutional right to a typewriter as an incident to the right of access to the courts. Cited in *Wolfish v. Levi,* 573 F.2d 118, 132 (2nd Cir. 1978).

█ Pre-trial detainees are ordinarily most interested in communication with attorneys as a vital component of their right to counsel in pending criminal prosecutions. Since the right to effective assistance of counsel under the Sixth Amendment extends only to criminal matters, see *Wolff v. McDonnell,* 418 U.S. at 576, 94 S.Ct. at 2984, 41 L.Ed.2d at 962, it is applicable solely to pre-trial detainees or to a convicted prisoner being tried on additional charges or contesting the legality of a previous conviction. *Taylor v. Sterrett,* 532 F.2d 462, 472 (5th Cir. 1976).

█ The right of access to the courts is available to both categories of prisoners to contest the legality of any conviction or the constitutionality of prison conditions. *Procunier v. Martinez,* 416 U.S. at 419, 94 S.Ct. at 1814, 40 L.Ed.2d 243.

There is no showing of any violation of the right to access to the courts as defined by the Supreme Court of the United States in *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), (Marshall, J.).

## G. ACCESS TO MEDICAL SERVICES

Plaintiffs complain that they do not have prompt and adequate access to medical services which amounted to cruel and unusual punishment. It is questionable whether the Eighth Amendment's prohibition against cruel and unusual punishment is applicable to a pre-trial detainee, the most accepted view being that the amendment's proscription applies only after conviction. See the discussion in *Rhem v. Malcolm,* 507 F.2d 333 (2nd Cir. 1974); *Johnson v. Glick,* 481 F.2d 1028 (2nd Cir.), cert. denied 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973); *Anderson v. Nosser,* 456 F.2d 835 (5th Cir. en banc), cert. denied, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972). However this does not mean that there is no constitutional protection for a pre-trial detainee. The Seventh Circuit in *Duran v. Elrod,* 542 F.2d 998 (7th Cir. 1976) stated that suits by pre-trial detainees alleging conditions amounting to cruel and unusual punishment

are better analyzed as due process attacks on conditions that exceed the sole permissible state interest of ensuring presence at trial.

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court distinguished medical malpractice cases cognizable under state tort law and those rising to the level of a constitutional abridgement. After discussing the government's obligation to furnish medical services to prisoners, the Court articulated the standard for determining whether a constitutional violation had occurred:

> "We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' *Gregg v. Georgia,* (428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859) . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."
>
> "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.

> "Similarly, in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute a 'wanton infliction of unnecessary pain' or to be 'repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle, supra,* 429 U.S. at 104–06, 97 S.Ct. at 291 (footnotes omitted).

Members of the prison hospital staff visit each of the security units at the Indiana State Prison at least once per week. Each inmate in those units are seen once per week. None of the pre-trial detainees who were housed in the security units had life threatening medical ailments. On the security units, custody officers relay requests for medical and dental attention to the prison hospital. Custody officers make every effort to meet an inmate's medical and dental appointments. (Plaintiffs Exhibit No. 33). Plaintiff Lock was brought to the Indiana State Prison on November 15, 1974 and was placed in the hospital, wherein he received extensive medical care. (Testimony of Dr. Sayors and Lock). Plaintiff Carpenter was seen by a prison physician shortly after his arrival at the Indiana State Prison and indicated that he had no medical complaints (Testimony of Dr. Sayors). Upon his arrival at the prison plaintiff Washington was housed in the hospital, wherein he was examined and given medical attention. (Testimony of Washington).

■ To establish a constitutional violation, the indifference must be deliberate and the actions intentional. Moreover, not every illness or injury invokes the constitutional protection—only those that are "serious" have that effect. Neglect, carelessness or malpractice is properly the subject of state tort action.

Plaintiffs have showed no facts that would lead this court to believe that plaintiffs' access to the medical staff is so grossly inadequate and haphazard or that it is so unresponsive to plaintiffs' needs that it is cruel and unusual punishment. There is no convincing evidence that defendants have failed to provide the plaintiff class with adequate medical care to meet their medical needs. Disagreement over medical judgments does not rise to a constitutional violation, *Estelle, supra,* 97 S.Ct. at 293; *McCracken v. Jones,* 562 F.2d 22, 24 (10th

Cir. 1977); difficulty in getting to see a doctor does not rise to a constitutional violation, *Cotton v. Hutto,* 540 F.2d 412, 414 (8th Cir. 1976) citing *Macon v. Ciccone,* 517 F.2d 73, 75 (8th Cir. 1975); disagreement between physician and prisoner over the course of medical care does not rise to a constitutional violation, *Davis v. Schmidt,* 57 F.R.D. 37 (W.D.Wis.1972), citing *inter alia, U.S. ex rel. Lawrence v. Ragen,* 323 F.2d 410 (7th Cir. 1963); *Henderson v. Pate,* 409 F.2d 507 (7th Cir. 1969).

Plaintiffs produced no medical testimony to substantiate their medical claim. Such is required. *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, (3rd Cir. 1976). Although negligence does not rise to the level of a constitutional violation, plaintiffs presented no medical testimony to show the standard medical practices. All that was presented were inmate complaints.

The medical facilities and personnel and their services provided to pre-trial detainees at the Indiana State Prison are nothing like Alabama's *Pugh v. Locke,* 406 F.Supp. 318 (N.D.Ala.1975); New York's *Todaro v. Ward,* 565 F.2d 48 (2nd Cir. 1977); Michigan's *Westlake v. Lucas,* 537 F.2d 857 (6th Cir. 1976); Rhode Island's *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977); or Texas' *Smith v. Sullivan,* 553 F.2d 373 (5th Cir. 1977).

■ Plaintiffs' major contention with regard to medical care was that pre-trial detainees are not routinely given a complete physical examination. The Fifth Circuit in *Smith v. Sullivan, supra* at p. 380 found that it was not necessary to require that all incoming prisoners be given a medical examination within 36 hours of incarceration in the absence of reasonable grounds to suspect that an inmate requires such examination to protect himself or others. Citing *Estelle, supra.* Plaintiff failed to produce any evidence that reasonable grounds existed to suspect that any pre-trial detainee who did not receive a medical examination required said examination.

## H. DISCIPLINE

■ Only Plaintiff Carpenter was subject to any discipline while housed at the prison as a pre-trial detainee. On July 26, 1975 Plaintiff Carpenter was issued a conduct report written up by Captain Park for damaging state property, and delivered to him by Lt. Hood. A hearing was held before the Conduct Adjustment Board. None of the C.A.B. members participated in the investigation of the conduct report. After hearing evidence, the C.A.B. found that plaintiff Carpenter committed the prohibited act as charged; and sentenced him to sixty days on the NSB unit. Carpenter received a review of that sentence thirty days after being sentenced to the NSB unit. This procedure was pursuant to the Adult Authority Disciplinary Policy. The procedure adhered to *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). See also, *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Plaintiffs made no showing that Carpenter was illiterate or that the issues of that case were so complex that he was unable to collect and present the evidence necessary for an adequate comprehension of the case. Aid from a fellow inmate or help from the staff or from a sufficiently competent inmate designated by the staff was not required. Plaintiffs made no showing of any constitutional violation as it relates to disciplinary procedure.

## I. USE OF TEAR GAS

■ On June 25, 1975 plaintiff Carpenter had a food tray in his cell on the A&O Unit and was banging it on the cell bars. He refused repeated orders to give up his tray, whereupon tear gas was used to retrieve the tray. A metal tray is to be considered as a weapon and tear gas is the most humane, non-violent method of debilitating the inmate in order to remove the weapon so that no one is physically injured.

On October 11, 1975, the Warden and his family were kidnapped by escapees from the NSB unit. This was an extreme emergency situation. Plaintiffs Carpenter and Lock were housed on the south side of that

unit and were causing a disturbance and inciting others to join in that disturbance. Captain Hoover and other custody staff made repeated orders to quiet down Carpenter and Lock so that order could be restored on that unit. Carpenter and Lock continued in their disturbance. Captain Hoover did spray tear gas to the floor of Carpenter's and Lock's cell. In both of these incidents and every other incident involving the use of tear gas reasonable force was used. There was a need for the application of tear gas in both incidents. The amount of tear gas was reasonably related to the need for such force. In both incidents no significant injury resulted. The force was applied in a good faith effort to maintain and restore discipline and order.

*Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), stands for the proposition that application of undue force by law enforcement officers deprives a suspect of liberty without due process of law. The same principle can extend to acts of correctional officers, although the notion of what constituted undue force may not necessarily be the same. The *Rochin* test is conduct that shocks the conscience.

In *Johnson v. Glick,* 481 F.2d 1028 (2nd Cir. 1973) the test is whether the complaint alleges an unprovoked attack on a prisoner, by a state prison guard.

In both incidents the constitutional requisites to state a claim have not been met.

## J. REHABILITATION

■ There is no constitutional right to rehabilitation. *Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), cert. denied 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). Federal Courts do not intervene in the area of rehabilitation. *Jackson v. McLemore,* 523 F.2d 838, 839 (8th Cir. 1975); *Novak v. Beto,* 453 F.2d 661, 670–671 (5th Cir. 1971). There is no constitutional right to vocational training, *Russell v. Oliver,* 392 F.Supp. 470, 474 (W.D.Va.1975); *Jordon v. Keve,* 387 F.Supp. 765 (D.Del.1974); *Pinkston v. Bensinger,* 359 F.Supp. 95, 99 (N.D. Ill.1973). There is no constitutional right to educational opportunities. *Diehl v. Wain-*

*wright,* 419 F.2d 1309 (5th Cir. 1970). Classification and work/educational assignments are matters within the discretion of institution administrators. *Altizer v. Paderick,* 569 F.2d 812, 813 (4th Cir. 1978), so long as no discrimination is involved. *French v. Heyne,* 547 F.2d 994 (7th Cir. 1975).

## K. LOSS OF PROPERTY

■ There are various claims for lost property. At most these claims sound in negligence but do not meet the wilful, reckless and intentional standards announced in *Bonner v. Coughlin,* 545 F.2d 565 (7th Cir. En Banc 1976), Swygert, J. dissenting.

## VI. QUALIFIED IMMUNITY AND GOOD FAITH

Chief Judge Fairchild speaking for the Seventh Circuit Court of Appeals in *Knell v. Bensinger,* 522 F.2d 720, 723, 724 (decided September 26, 1975) addressed the issue of qualified immunity for government officials:

". . . state executive officials do not enjoy an absolute immunity from personal liability as to all acts performed within the scope of their official duties (citations omitted). Rather, in varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief coupled with good faith belief formed at the time and in light of all the circumstances, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. . . . The policy consideration underlying the concept of immunity . . . for public officials is the necessity of insuring principled and conscientious governmental decision making by affording some measure of freedom from fear or personal liability

for the official exercise of discretion and the performance of required duties."

The Seventh Circuit found that the two prong test of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) applies equally to the official conduct of correctional administrators. That test is that there is no immunity from liability for damages under 42 U.S.C. § 1983:

> (1) if he knew or reasonably should have known that the action taken within the sphere of official responsibility would violate constitutional rights; or
>
> (2) if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury. *Wood* supra, 420 U.S. at 321–322, 95 S.Ct. at 1000.

The Supreme Court of the United States again dealt with the issue of qualified immunity in *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (decided February 22, 1978). The court reaffirmed *Wood* by holding state prison officials are entitled to immunity from liability for damages under 42 U.S.C. § 1983 unless they knew or reasonably should have known that the action that they took would violate a prisoner's constitutional rights or the action was taken with the malicious intention to cause a deprivation of constitutional rights or other injury. The immunity defense would be unavailing to prison officials if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct if they knew or should have known of that right and if they knew or should have known that their conduct violated the constitutional norm. In evaluating the state of the law reference should be made to the opinions of the Supreme Court, of the Courts of Appeals and of the local District Court. *Procunier, supra*, 434 U.S. at 565, 98 S.Ct. at 861, 55 L.Ed.2d at 33.

The Fourth Circuit Court of Appeals in *Kersh v. Bounds*, 501 F.2d 585 (decided July 25, 1974) was confronted with the allegation that state prison officials treated prisoners in safekeeping status, called safe-keepers, normally housed in county prisons at county expense, differently from the regular inmates under custody and control of the Department of Correction. The plaintiffs raised a violation of the Eighth Amendment. The Court of Appeals upheld the District Court's finding that plaintiff had not proved cruel and unusual punishment and only considered the equal protection claim. They found that safekeeper prisoners have not yet been committed to the custody and control of the Department, despite the fact that some are assigned for custodial purposes only at the expense of the county. Since the county prisoners are treated alike and the Department prisoners are treated alike, the Fourth Circuit was of the opinion that there was no equal protection violation. The Court used the rational basis test. They found that North Carolina had a rational basis for providing by law that counties shall pay for the upkeep of prisoners whose terms of confinement are uncertain and have not become fixed, who are subject to immediate return to the Sheriff of the County and who are ordinarily in the physical custody of the Sheriff of a county. Plaintiff did receive routine and emergency medical care. Failure to furnish other and additional elective medical care, which is not essential to the immediate welfare of the prisoners and the lack of which poses no threat to life or limb, the Court found that it was not irrational. The prime factor in their decision was the fact that safekeepers are in the custody of the Department only five months and are essentially county prisoners housed by the State on a temporary basis. The medical care was reasonable and rational and free from constitutional infirmity.

The Second Circuit, on July 31, 1975 decided *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392. The District Court held that mere discomfort of eating in a cell is not of itself an unconstitutional hardship, that different treatment may be accorded convicted detainees as opposed to pre-trial detainees, that overcrowding and double celling of detainees created an unconstitutional deprivation of pre-trial detainees due process and

equal protection rights. The Circuit Court affirmed the finding of unconstitutionality.

Again the Second Circuit, on June 29, 1973, decided *Johnson v. Glick*, 481 F.2d 1028 wherein the court held that liability under 42 U.S.C. § 1983 exists for an unprovoked attack on a prisoner by a correctional officer. Although the Court had doubt whether the cruel and unusual punishment clause is properly applicable at all until after conviction and sentence, they went on to hold that it would be absurd to hold that a pre-trial detainee has less constitutional protection against acts of prison guards than one who has been convicted. The Court recognized the *Rochin* test: "conduct which shocks the conscience," and established a formula for determining whether a constitutional violation has occurred.

Again the Second Circuit, in *Rhem v. Malcolm*, 507 F.2d 333 (decided November 8, 1974) dealt with conditions of pre-trial confinement at the Manhattan House of Detention for Men. The Court held that the demands of equal protection of laws and of due process prohibit depriving pre-trial detainees of rights of other citizens to a greater extent than necessary to assure appearance at trial and security of jail. Equal protection and due process provisions prevent unjustifiable confinement of pre-trial detainees under worse conditions than convicted prisoners. A pre-trial detainee is entitled to protection from cruel and unusual punishment.

The Seventh Circuit did address the issue of prison regulations concerning the right of prisoners to use the mails in *Bach v. Coughlin*, 508 F.2d 303 (decided December 20, 1974). The court recognized that although a prisoner has the right of access to the courts and legislature which necessarily includes the right to use the mails, he does not have a right to unlimited free postage. The regulations used by the Department of Corrections were a reasonable attempt to balance the right of the prisoner to use the mails with prison budgetary considerations.

The Supreme Court in *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718, (decided February 24, 1969), dealt with the issue of prisoner access to the courts. The Court held that a state prison regulation barring inmates from assisting other prisoners in preparation of petitions for post-conviction relief was in conflict with the federal right of habeas corpus, despite the state's claim that requirement was necessary to maintain prison discipline. In that case, the state did not provide available alternatives to assistance provided by other inmates.

It cannot be said that the constitutional rights of pre-trial detainees housed at a state maximum security institution designed to house convicted male felons pursuant to a unique Indiana statute were clearly established during the course of the complained of conduct which was the subject matter of this litigation.

The qualified immunity from liability for damages under 42 U.S.C. § 1983 should be availing to all of the named defendants because the constitutional rights allegedly infringed by them were not clearly established at the time of their challenged conduct. They did not know or could not have known of those rights and they did not know or could not have known that their conduct violated the constitutional norm. Defendants did not act with malicious intention to cause a deprivation of constitutional rights or other injury. At all times in their dealings with pre-trial detainees at the prison, defendants acted in good faith.

On the basis of the total record there is a failure to prove intentional, wilful, malicious or deliberately indifferent conduct as to any defendant. In addition, there is proof which this Court accepts to show complete good faith as defined in *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (February 22, 1978) by all defendants. Even the dissenting opinion of Mr. Justice Stevens therein support that conclusion here. He said:

"A public official is entitled to immunity for acts performed in the regular course of duty if he sincerely and reasonably believed he was acting within the sphere of his official responsibility . . . ."

*Procunier, supra*, Stevens J. dissenting at 571, 98 S.Ct. at 864.

The kind of evidence that will adequately support the defense will vary widely from case to case. Some defendants, especially those without policy-making responsibility, may establish their defense by showing that they abided by the institution's regulations or by its longstanding practices.

It has been widely and judicially declared that police officers and prison officials are not bound to predict the course of constitutional law. In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), Chief Justice Warren stated:

> "We agree that a police officer is not charged with predicting the future course of constitutional law." *Pierson, supra*, 87 S.Ct. 1213 at 1219.

This can certainly be said for Prison Wardens.

It is necessary to briefly mention a recent decision by our Court of Appeals in *Chapman v. Pickett*, 586 F.2d 22 (7th Cir.). One basic distinction here in contrast to *Chapman* is that the rights of pretrial detainees were not "clearly established at the time of the challenged conduct" in this case. More fundamentally, it is found here that no Eighth Amendment violations were proven. So this case doesn't turn on whether the good faith defense as announced in *Wood v. Strickland* and extended in *Procunier v. Navarette* is available to an Eighth Amendment claim under 42 U.S.C. § 1983.

There have been no cases dealing with the rights of pretrial detainees in this district. The Supreme Court of the United States has. not yet spoken definitively on the subject. Most of the cases emerged in the mid-1970's. The Court of Appeals in this circuit first spoke on the subject in *Duran* on October 22, 1976. To his great credit Warden Duckworth and his staff were concerning themselves with this subject as early as 1975. This type of preventive detection of possible constitutional problems is to be greatly encouraged and admired. It tends to solve prison problems where they should be solved—in the prison and not in the federal courts. As a result

of this ongoing concern there were changes in programs and procedures just as there were variations in the approach of the federal judiciary. One has only to review the various changes and modifications made by Judge Lasker in the *Rhem v. Malcolm* case to realize that no federal judge wants to place an unnecessary constitutional straightjacket on any warden, especially one, as here, who is doing the very best possible job under trying circumstances and limited resources. In this regard one must return to the thoughtful analysis of Chief Judge Irving Kaufman in *Wolfish v. Levi*, 573 F.2d 118 (2d Cir. 1978) when he said:

> "When the history of our criminal justice system is chronicled, no doubt one of its most sobering pages will describe the sad state of this nation's prisons and jails. Whether it be in filthy, narrow cells of an Alabama penitentiary or in overcrowded dormitories in a Bronx house of detention, we have quartered individuals, both convicted or merely accused of crimes, major and minor, under conditions that shock the conscience of civilized men. To redress these glaring deficiencies, courts have often been summoned to insure that, at the least, minimum standards of human decency are met. And, when inhuman or barbaric conditions, or in the case of pretrial detainees, substantial deprivations not compelled by administrative necessity, are discovered, judges should not hesitate to enter the breach.
>
> "But, courts are singularly ill-suited to administer the minutiae of the daily affairs of prisons. Accordingly, although district courts are empowered with broad discretion to frame equitable remedies so long as the relief granted is commensurate with the scope of the constitutional infraction, a trial judge must tread carefully in less substantial matters best left to the expertise of prison officials."

There is a great temptation by the members of this craft to attempt the solution of cases and problems by decree. Many cases compel the entry of broad gauged and far reaching decrees. Apparently Judge Frank M. Johnson found himself in such a situa-

tion in *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976); affirmed in *Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977). This, however, is not such a case. The absence of any constitutional violation precludes the entry of any such mandatory injunction.

These plaintiffs had the assistance of experienced lawyers aided by law student legal interns. They were given a full opportunity to present and develop their claims. They have failed to prove any constitutional claims and therefore relief must be denied. No costs are here assessed as it is the Court's order the same will be borne by such party.

## APPENDIX A

### PERSONAL RESUME

Anthony S. Kuharich, 17048 Wausau Avenue, South Holland, Illinois, 60473; Phone No. 312/596–6541.

*Birth data* : January 15, 1913, South Bend, Indiana. Oldest of four children born to Martin and Theresa Kuharich, nee: Alterman.

*Marital History* : Married Irene M. Mich, April 20, 1940, South Bend, Indiana.

One son, Martin A., born March 11, 1949, Hammond, Indiana. Graduated University of Notre Dame, 1971. Married. Employed Illinois Department of Capital Development, Springfield, Illinois.

### EDUCATIONAL HISTORY

January, 1931—Graduated, Central Senior High School, South Bend, Ind.

June, 1935—BA—Education—University of Notre Dame.

June, 1941—MA—History—University of Notre Dame.

June, 1954—MSIR—Sociology—Loyola University, Chicago, Illinois.

### EDUCATIONAL HONORS

June, 1961—Awarded Honorary Doctor of Laws Degree—LLD—Atlanta Law School, Atlanta, Georgia.

## EMPLOYMENT HISTORY

Since February, 1977—Jail Consultant for National Institute of Corrections, Washington, D. C. (Part time)

August 4, 1974 to February 12, 1977—Executive Assistant to the Warden, Metropolitan Correctional Center, Chicago, Illinois, U. S. Bureau of Prisons. (Retired)

January, 1975 to 1978—Instructor (part time) in Corrections Program, Chicago State University, Chicago, Illinois.

January, 1976 to Present—Adjunct Professor (part time) in Criminal Justice Program, Loyola University, Chicago, Illinois.

January to July, 1974—Jail Consultant, American Correctional Association, College Park, Maryland.

March 2, 1970 to January 2, 1974, Chief, Bureau of Detention Standards and Services, Illinois Department of Corrections, Springfield, Illinois.

September 6 to December 19, 1973, Instructor (part time) in Sociology Department, MacMurray College, Jacksonville, Illinois.

July 7, 1969 to February 28, 1970, Jail Administrator, Wayne County Jail, Detroit, Michigan.

January 12, 1970 to February 28, 1970, Instructor (part-time) in the Criminal Justice Program, University of Detroit, Detroit, Michigan.

January 29, 1969 to July 6, 1969, Superintendent, Indiana State Farm, Greencastle, Indiana.

April 1, 1967 to January 13, 1969, Indiana Commissioner of Corrections, Indianapolis, Indiana.

December 1, 1966 to March 31, 1967, Special Assistant to the Indiana Commissioner of Corrections, Indianapolis, Indiana.

November 1, 1946 to November 30, 1966, Chief U. S. Probation and Parole Officer, U. S. District Court, Northern District of Indiana, Hammond, Indiana.

September, 1953 to January, 1967 Assistant Professor (part-time) in the Department of Sociology and Social Work, Valparaiso University, Valparaiso, Indiana.

September, 1954 to June, 1959, Instructor (part-time) in the Law Enforcement and Corrections Program, St. Joseph's College Calumet Center, East Chicago, Indiana.

September, 1956 to June, 1963, Instructor (part-time) in the Sociology Department, Purdue University Calumet Center, Hammond, Indiana.

June, 1945 to August, 1946, Principal Welfare Officer, United Nations Relief and Rehabilitation Administration (UNRRA) in Displaced Persons Camps in Germany.

January, 1943 to June, 1945, U. S. Army, Special Agent, Security Intelligence Corps, Washington, D. C. (Military Service)

January, 1940 to January, 1943, Chief Probation Officer, City Court, South Bend, Indiana.

August, 1938 to January, 1940, Teacher and Counselor, Gibault School for Boys, Terre Haute, Indiana. (This is a school for delinquent, dependent, and neglected boys.)

## SPECIAL RECOGNITIONS

1957—GOOD GOVERNMENT AWARD— Hammond, Indiana Junior Chamber of Commerce.

1959—MAN OF THE YEAR AWARD— Hammond, Indiana Exchange Club.

1960—MAN OF THE YEAR AWARD— Hammond, Indiana Exchange Club.

1962—MAN OF THE YEAR AWARD— University of Notre Dame and the Notre Dame Club of the Calumet Region.

1964—ED. SPOERNER MEMORIAL AWARD—In recognition for Outstanding Work in the Hammond Youth League.

1966—HAMMOND POLICE ADVISORY BOARD AWARD—City of Hammond, Indiana.

1966—LAKE COUNTY LAW ENFORCEMENT COUNCIL AWARD.

1967—BOOK OF GOLDEN DEEDS AWARD—Hammond, Indiana Exchange Club.

1967—OUTSTANDING SERVICE AWARD—Department of Social Work, Valparaiso University.

1967—SCALES OF JUSTICE AWARD— National Council on Crime and Delinquency.

1971—JOHN HOWARD ASSOCIATION AWARD—Outstanding service for establishing jail and detention services in Illinois.

## MEMBERSHIPS IN PROFESSIONAL ORGANIZATIONS

American Correctional Association; member since 1953; Board of Directors from August, 1967 to October, 1970; re-elected August, 1973 to August, 1978.

National Council on Crime and Delinquency; member since 1947; member Professional Council 1958 to 1972; Central Regional Vice-Chairman 1963–1965 and 1969–1971.

National Association of Social Workers; Charter member since 1956. Member of Academy of Certified Social Workers. (ACSW)

Illinois Academy of Criminology, Member since 1965; Served on Executive Board 1973–74.

National Jail Association, Inc.; Member since 1971.

National Sheriffs' Association; Member since 1971.

## PUBLICATIONS

"What Can We Do About Juvenile Delinquency?", POLICE, September-October and November-December, 1958.

"Probation—What Does It Mean?", THE CRESSET, April, 1959. (Valparaiso University publication)

"The Importance of Training for Correctional Officers in Local Jails." 1973 PROCEEDINGS OF THE AMERICAN CORRECTIONAL ASSOCIATION.

Approximately 50 Book Reviews published in FEDERAL PROBATION, CRIME AND DELINQUENCY, POLICE, and THE CRESSET.

## PROFESSIONAL ACTIVITIES

As Chief, Bureau of Detention Standards and Services, Illinois Department of Corrections, 1970–74, developed the jail standards inspected all the jails in Illinois, provide technical assistance to upgrade the jails, and administered a grant-in-aid program for the local facilities and their operations.

Served as a consultant to the National Sheriffs' Association in developing the "Guidelines for Jail Operations" and the seven handbooks on pertinent aspects of jail management and operations.

Provide technical assistance to more than 50 jails outside of Illinois in all areas of jail management, operations, and staff training.

Met with several State Committees on jails to assist them in developing jail standards.

Served as Principal Staff Consultant to the Commission on Accreditation for Corrections in developing the MANUAL OF STANDARDS FOR ADULT LOCAL DETENTION FACILITIES which was published in January, 1978.