Mark Alan HUTCHINGS et al., Plaintiffs,

v.

Jack CORUM et al., Defendants.

No. 79–0600–CV–W–4.

United States District Court, W. D. Missouri, W. D.

June 27, 1980.

Claudia York, Kansas City, Mo., G. Patrick Wiederaenders, Liberty, Mo., for plaintiffs.

John M. Crossett, Liberty, Mo., for defendants.

## OPINION AND ORDER

ELMO B. HUNTER, District Judge.

This is a class action[1] challenging the constitutionality of numerous conditions and practices at the Clay County Jail ("CCJ") located in Liberty, Missouri. Plaintiffs are seeking an order for declaratory and injunctive relief in a number of specific areas. The complaint charges that prisoners at the CCJ are (1) subjected to summary, harsh, and brutal punishment and conditions, (2) deprived of life and liberty without due process of law due to unsafe and unsanitary conditions in the CCJ which are punitive in nature and constitute punishment prior to trial for pretrial detainees, (3) denied due process of law by the imposition of punishment for alleged violation of jail rules, (4) denied effective representation of counsel and a fair trial because of defendants' practices, procedures, acts and policies which deny or eliminate access to counsel and to legal materials, (5) denied access to the courts because of the lack of an adequate law library or a reasonable alternative, (6) denied free speech and association by the limitation of contact by telephone and personal visits with inmates' families and friends, (7) subjected to unreasonable search and seizure of papers and effects and the careless handling of inmates' property, and (8) denied the right to practice their

---

1. This cause was certified as a class action by order of this Court on March 3, 1980. The class was divided into two subclasses. The first subclass is comprised of "all pretrial detainees now confined or will be confined in the CCJ." The second subclass is comprised of "all persons now confined or [who] will be confined in the CCJ following conviction of offenses against the State of Missouri, and any others not included in [the first subclass]." See, Order Certifying Suit as Class Action.

religions by the defendants' failure to provide religious services or special diets required by certain faiths.

The case was fully tried to the Court on June 2, 3, and 4, 1980, in Kansas City, Missouri.

This action is brought pursuant to 42 U.S.C. § 1983. Plaintiffs allege violation of the First, Fourth, Sixth, Eighth, and Fourteenth Amendments to the Constitution. This Court has jurisdiction conferred through 28 U.S.C. § 1343(3) and (4) and 28 U.S.C. § 2201 and § 2202.

## I

The parties have stipulated to a number of facts which require no proof.

1. The CCJ was errected in 1927 to serve as a "county" jail. At that time the population of Clay County was approximately 26,800. The county now has a population of approximately 132,000.

2. The inmates in the CCJ, both pretrial detainees and sentenced inmates, are housed on all three floors of the structure.

A. The second or top floor contains the following:

(1) Two four–bunk cells known as "classification" ("C–1 and C–2") which each contain an area of approximately 105 square feet;

(2) Two four–bunk cells known as "maximum security" (North Max. 1 and South Max. 1) which contain an area of approximately 168 square feet each, and a shower stall measuring 9 square feet, in each cell;

(3) Four two–bunk cells ("North Max. 2, South Max. 2, North Max. 3, and South Max. 3") which measure 78 square feet each;

(4) A six–bunk cell used for housing trustees ("Trustee Cell") measuring 184 square feet with some hall space and a separate bathroom measuring approximately 62 square feet;

(5) An area used as the office for the jail commanding officer, measuring 208 square feet with a adjoining shower and closet measuring 36 square feet.

B. The first or middle floor contains the following:

(1) Two four–bunk cells ("North Main 2 and South Main 2") measuring 191 square feet each with a 9 square foot shower area in each cell;

(2) Two four–bunk cells ("North Main 1 and South Main 1") measuring approximately 206 square feet each and a 9 foot shower area in each cell;

(3) Kitchen area;

(4) Nurses' station;

(5) Visiting area;

(6) Desk or booking area.

C. The basement or lower floor contains:

1. Two four–bunk cells ("North Bas. 2 and South Bas. 2") measuring approximately 191 square feet each with 9 square foot shower areas in each cell;

2. Two four–bunk cells ("North Bas. 1 and South Bas. 1") measuring approximately 206 square feet each, with a 9 square foot shower area in each cell.

3. Showers and open toilet areas are contained in each cell, except for the trustee cell which has a separate enclosed bathroom. There is no separate dayroom for any cell.

4. No indoor area is provided for exercise or recreation. An L–shaped outside area was paved and fenced for recreational use in 1979. It measures approximately 1,219 square feet.

5. The CCJ's inmate population fluctuates. For the past year, the average daily number of prisoners incarcerated in the jail is 49.

6. The length of time inmates are incarcerated at the CCJ also varies. The lengths of incarceration at CCJ from June 1, 1979 to May 28, 1980 were as follows:

| 1 to 3 days | 2395 inmates |
| 4 to 10 days | 175 inmates |
| 10 to 30 days | 115 inmates |
| 1 to 3 months | 107 inmates |
| 3 or more months | 59 inmates |

7. There are four window air conditioning units on each floor, and above the air conditioning units are opaque glass bricks.

There is also an exhaust vent and fan on the roof. To provide additional ventilation fans are brought in and the front door is opened, when weather permits.

8. The cleaning in cell areas is done by the inmates. The hallways and other common areas are cleaned by trustees accompanied by a deputy.

9. Inmates are required to eat their meals in their cells.

10. The lights are outside the cell areas in the hallways except on the second floor where they are enclosed in cages within the cells. There are no electrical outlets in the cells. Extension cords, plugged into the light fixtures, run across and above the aisles into the cells.

11. Since March 1, 1980, visitation takes place only on the weekend. The visitation area is one room on the south side of the jail and is 4'5" wide and 11'8" long. The inmate is allowed no physical contact with his visitors. He can only see them through a glass barrier and speak with them through a telephone headset intercom. There are 9 windows and 6 phones.

12. The only written rules and regulations issued to inmates consist of a list of infractions classified by level of seriousness. Included with this list is a statement as to the punishment to be given if a certain rule is broken.

13. No women have been housed at the CCJ since July 1, 1979. Women are only in the jail for booking and for hearings.

## II

### THE CONSTITUTIONAL STANDARDS FOR PRETRIAL DETAINEES AND CONVICTED PRISONERS

As this Court has noted in prior opinions, judicial review by a federal court concerning conditions within state penal institutions must be conducted within a constitutional framework. *See, Burks v. Walsh,* 461 F.Supp. 454 (W.D.Mo.1978), *aff'd. sub. nom. Burks v. Teasdale,* 603 F.2d 59 (8th Cir. 1979); *Burks v. Teasdale,* 492 F.Supp. 650 (W.D.Mo.1980); *Eckerhart v. Hensley,* 475 F.Supp. 908 (W.D.Mo.1979).

■ Review of prison conditions relating to convicted inmates is generally made pursuant to the proscriptions of the Eighth Amendment. *See, Campbell v. Cauthron,* 623 F.2d 503 (8th Cir. 1980); and *Burks v. Teasdale, supra.* In *Campbell,* the Eighth Circuit has recently delineated the appropriate analytical guidelines for Eighth Amendment inquiry.

"Like most constitutional declarations, the exact meaning of 'cruel and unusual punishment' is somewhat elusive. Consequently, we look to the broad principles underlying the constitutional terms. 'The basic concept is nothing less than the dignity of man ... [T]he words of the Amendment are not precise, and ... their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' *Trop v. Dulles,* 356 U.S. 86, 100–101 [78 S.Ct. 590, 597–98, 2 L.Ed.2d 596] (1958) (footnote omitted). The amendment prohibits penalties 'that transgress today's "broad and idealistic concept of dignity, civilized standards, humanity, and decency."' *Hutto v. Finney,* 437 U.S. 678, 685 [98 S.Ct. 2565, 2571, 57 L.Ed.2d 522] (1978) quoting *Estelle v. Gamble,* 429 U.S. 97, 102 [97 S.Ct. 285, 290, 50 L.Ed.2d 251] (1976); *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir. 1966)."

■ The Eighth Circuit also noted in *Campbell* that prison conditions for unconvicted persons are to be judged against the "due process standard of the Fifth and Fourteenth Amendments." (citing *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Further, the *Campbell* decision makes clear that conditions within a penal institution which are unconstitutional for convicted persons under Eighth Amendment review are likewise an abridgement of the due process guarantees afforded unconvicted persons. *Campbell v. Cauthron, supra,* at p. 505; *see also, Detainees of Brooklyn House of Detention for Men v. Malcoln,* 520 F.2d 392, 398 (2nd Cir. 1975); and *Inmates of Allegheny City, Jail v. Pierce,* 612 F.2d 754, 762 (3rd Cir. 1979).

 Prisoners are also afforded other constitutional guarantees. For instance, prisoners possess First Amendment protection for speech and religious practices, *see Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), and due process and equal protection rights under the Fourteenth Amendment, *see Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), among others. *See Generally, Bell v. Wolfish, supra*, 99 S.Ct. at 1877.

 Nonetheless, it is axiomatic that a federal court's review of the conditions within a state penal institution must be limited solely to those conditions which result in constitutional deprivations. This Court can intervene only when confronted with clear constitutional violations. *See, Bell v. Wolfish, supra* at 1886; *Burks v. Teasdale, supra*, 603 F.2d at 62; and *Campbell v. Cauthron, supra*, at p. 505.

Having observed the appropriate dimensions of constitutional review, this Court will now turn to the conditions at the CCJ as revealed by the testimony, documentary evidence, and stipulations.

### III.

### A. PHYSICAL CONDITIONS AT CCJ

#### 1. *Plumbing System*

The testimony indicated that the physical capabilities of the plumbing system were adequate. However, the testimony revealed serious problems with the functioning of the system. The system is constantly in need of repair because inmates flush clothing and other materials down the stools and shower drains, causing blockages. Repair of this condition results in spillage of sewage and water in the access aisle.[2] This spillage then, on occasion, leaks down through the floors into cells on the floor below. The inmates testified that their mattresses were often soaked with the spillage, forcing them to sleep on the floor or on the tables that are located in each cell.[3]

Mr. VanBeber testified that the plumbing system causes the greatest structural problems at the jail. He further testified that he knew of no way to correct the spillage problem given the inmates' propensity to bring the condition upon themselves.

There was also testimony about "rain" inside the cells. The condition apparently is the result of condensation on the ceilings of the cells following showers taken by the inmates. When it occurs, it is immediately cleaned up.[4]

Lastly, the inmates complained about a lack of hot water for the showers. The bulk of the testimony indicated that this minor problem only arises after meal times because of the hot water usage by the dishwasher.[5]

#### 2. *Electrical System and Appliance Use*

The inmates' testimony indicated that the lights are located in the hallways outside the cells and remain on 24 hours a day.[6]

---

**2.** Between the cell blocks on each of CCJ's three floors is a separate aisle wherein the plumbing is exposed for maintenance access. See Pls.' Exs. Nos. 1, 2 and 3.

**3.** See test. of former inmates John Lear, Mark Hutchings and Michael Guthrie. See also test. of maintenance supervisor, Les VanBeber.

**4.** See test. of jail administrator Captain C. O. Hanson.

**5.** See test. of Captain Hanson and Mr. Lear.

**6.** There is a rheostat mechanism but the evidence showed that it is hardly ever used.

Mr. Robert Buchanan, President of Correctional Services Group (a consulting firm for correctional institutions), testified that the level of lighting at the CCJ was deficient, although he had not measured the lighting during his visit. He testified that the accepted standard is 50 foot–candles of light.

Mr. Hutchings testified that there was sufficient light to read. Further, he states that the light bulb was just outside his cell and he would reach out and unscrew it whenever he and his cellmates wanted it darker.

There is little or no natural light. The windows in the cell blocks have been blocked with either cement blocks or glass bricks which are somewhat translucent. Each cell is equipped with a television and some cells have radios. These appliances are powered from electrical current drawn from extension cords which enter the cells. The testimony revealed that the noise level in the cell blocks is very high, as inmates watch television or play the radios throughout the night. As a consequence, inmates tend to sleep during the days. See test. of Messrs. Lear and Hutchings. Mr. Lear testified that he had to buy earplugs in an effort to sleep at night amidst the din. Mr. Hutchings complained that there was no emergency lighting system and that during power outages the jail became completely dark. But Captain Hanson testified that there currently is an emergency lighting system on the second floor and at the top of the stairway.

### 3. *Heating, Cooling and Ventilation Systems*

The evidence did not reflect any significant problems with the heating system. See test. of Messrs. Lear, Hutchings and VanBeber.

The air conditioning is supplied from 12 window units installed on the outside walls of the jail. Mr. VanBeber testified that he has had problems keeping the machines in working condition. He stated that, at most, only three of the 12 units have been inoperable at one time.

These air conditioning units, coupled with an exhaust fan on the roof located in the ceiling of the access aisles on the second floor, are the sole sources for ventilation in the building. See, test. of Mr. VanBeber and Captain Hanson. The testimony of both plaintiffs' and defendants' witnesses indicated that the ventilation system is extremely inadequate. Mr. Lear stated that the air was always stagnant and had a "human" smell. Mr. VanBeber described the air condition as musty. He further

noted that the exhaust fan was only slightly effective on the second floor. Captain Hanson also was strongly critical of the ventilation system. He considers the current ventilation situation to constitute inhumane treatment. He testified that in order to remedy the situation, the windows should be unplugged so that they can be opened and closed. Captain Hanson perceived no security risk in operating the jail with windows as long as bars were placed on the outside.

### 4. *Fire Protection*

Captain Myron Schmidt of the Liberty, Missouri, Fire Department testified at some length regarding his evaluation of the safety of the CCJ in the event of a fire. Captain Schmidt noted that the structure is primarily composed of concrete, which is the best fire resistant building material. Beyond this, Captain Schmidt had several criticisms of the present structure. He testified that he previously made the following recommendations for improving the safety of the building:

i.) install fire alarms and smoke–heat sensors;

ii.) hold fire drills for jail employees;

iii.) change the "house lines"[7] because they are too large for non–professionals to control them;

iv.) install emergency lighting;

v.) hold training sessions for jail employees on the proper use of fire fighting equipment;

vi.) install fire extinguishers;

vii.) install fire doors in order to compartmentalize a fire;

viii.) install an emergency exit on the east side of the building; and

ix.) reinstall the windows.

Captain Schmidt was very concerned about the present structure because it has only one exit. His opinion was that the situation is very dangerous. He stressed

---

**7.** "House lines" are the internal water hose devices in the CCJ. Captain Schmidt indicated that the hoses require adjustable nozzles to make them suitable for use by the jail staff.

the need for windows in order to eliminate deadly gases and smoke in the event of a fire. In sum, Captain Schmidt testified that the building could be made much safer if another exit were installed[8] and the windows were reopened.[9]

On cross–examination, Captain Schmidt indicated that after he made his recommendations, a number of his proposals had been implemented. Fire alarms and emergency lighting have been installed. Captain Schmidt has personally conducted training sessions on evacuation techniques with the staff at CCJ. It was revealed that the doors at the jail have been color–coded with the keys to reduce confusion in an emergency. Smoke masks with compressed air tanks have been purchased to allow access by rescue personnel into smoke filled rooms. And flame retardant mattresses have been purchased for all of the cells.

Nevertheless, Captain Hanson conceded that despite these improvements there is a real and substantial hazard of fire in the building on all three floors.

### 5. *Sanitary Conditions*

The testimony generally indicated that although the jail is old and the walls are cracked and waterstained, CCJ is relatively clean. See test. of Messrs. Lear, Guthrie, Hutchings, Buchanan, Hanson, Dr. Edward Twin, and R. Stephen Pecoraro.[10] There are exceptions to this general finding inasmuch as the occupants of each cell are responsible for cleaning their own quarters and some inmates apparently allow conditions to deteriorate within their individual cells. The jail supplies brooms, mops, buckets, soap, and disinfectant on a daily basis. See test. of Captain Hanson. If the in-mates in a particular cell fail to clean the cell, then a trustee does it.

There was no significant evidence of a vermin problem at CCJ.

The mattresses are relatively new. Captain Hanson indicated that he arranged for the purchase of 76 new mattresses in October, 1979, when he began his tenure at CCJ. He testified that his staff attempts to clean the mattresses once a month by disinfecting them and airing them out.

The laundry, as well, presented no significant problem. The "county" laundry, i. e., sheets, towels, etc., is laundered once a week. "Personal laundry" is done twice a week. See test. of Capt. Hanson.[11]

### B. PRACTICES AND POLICIES AT CCJ

### 1. *Recreation*

As indicated in the stipulations, an exercise area was created for the inmates in 1979. The evidence indicated that the paved lot contains a basketball hoop and that there is a weight set available for inmate use. Also, the inmates play handball against the wall of the jail.

The inmates testified that they received exercise only sporadically. Further, the inmates testified that they are confined in their cells for months at a time, never receiving the opportunity to exercise. See test. of Messrs. Lear and Hutchings.

The experts were all in agreement that exercise is an extremely important part of an inmate's daily regimen. See test. of Drs. Pecoraro and Twin, and Messrs. Hanson and Buchanan.

Mr. Buchanan testified that correctional facilities standards with which he is famil-

---

8. Captain Schmidt testified on recross–examination that ideally the additional exit should be a smoke–proof fire stairwell.

9. He was also critical of the jail policy allowing inmates to smoke in the cells and the use of electrical extension cords in the cells.

10. Dr. Pecoraro is a doctor of osteopathy who is on call at all times for medical services at CCJ. Dr. Twin is a medical doctor and a professor of medicine at the University of Missouri, Kansas City School of Medicine. He was directly responsible for the development of the health care delivery system at the Jackson County, Missouri, Jail and has been retained as a consultant to numerous other jails. Dr. Twin was unavailable at the time of trial and his testimony was preserved through his deposition taken May 21, 1980.

11. Mr. Lear complained that the laundry was collected at 2 a. m. and not returned until 6 a.m., forcing him to sleep on a bare mattress.

iar require at least one hour per day of recreation outside the cell. He stated that a lack of this minimum amount of exercise can result in physical and psychological impairment. In particular, he stressed the importance of exercise as a vehicle to reduce the stress and anxiety inevitably caused by confinement for extended periods of time.

Captain Hanson stated that he wants to provide each inmate one hour of exercise per day, but that his deputy staff is insufficient to properly maintain a recreational program on such a regular basis. He testified that he would need at least three additional staff members to accomplish this goal. Captain Hanson testified that as conditions currently exist, the inmates received exercise only three times during the entire month of May, 1980. He noted that on the days when exercise is provided there is a complete change in the inmates. He stated that they are generally calm, sleep well, and are less hostile.

### 2. *Overcrowding*

Mr. Buchanan's testimony was extremely critical of the cell space afforded to individual prisoners at CCJ. He stated that depending upon the cell, an individual inmate has from 21 to 48 square feet of space. He testified at length regarding various standards for minimum space allotments. For instance, the Commission on Accreditation for Corrections ("CAC") recommends 70 square feet per inmate, but that 60 square feet can be acceptable. The Law Enforcement Assistance Administration ("LEAA") recommends 80 square feet if fixtures take up a significant amount of space. Further, these associations recommend that there be "dayroom" space supplied in addition to the cell space; the CAC recommends 35 square feet per inmate and the LEAA recommends 45 square feet.

Regarding the cell space at CCJ, in response to questioning by the Court, Mr. Buchanan offered his opinion on the number of inmates that could be housed in the

CCJ in a humane fashion. His testimony can be summarized as follows:

i.) In C–1 and C–2, it is cruel and inhumane to house 4 men in these cells. The maximum number allowable would be 2 men in each cell;

ii.) In North Max. 3, South Max. 3, North Max. 2 and South Max. 2, it is cruel and inhumane to place more than 1 inmate in each of these cells;

iii.) In North Max. 1 and North Max. 2, it is cruel and inhumane to place more than 2 inmates in each of these cells;

iv.) In the Trustee Cell, due to the greater amount of time these inmates spend outside of this cell, 6 inmates can be housed there without constituting cruel and inhumane conditions;

v.) In North Main 2, South Main 2 and North Main 1, it is cruel and inhumane to house more than 2 inmates in each of these cells;

vi.) In South Main 1, it is cruel and inhumane to house more than 2 inmates in this cell unless it is used to house work release prisoners who spend the day away from the jail. The cell could accommodate 4 work release inmates without being cruel and inhumane to the occupants;

vii.) In North Bas. 1, South Bas. 1, North Bas. 2 and South Bas. 2, it is cruel and inhumane to house more than 2 inmates in each of these cells;

viii.) The total number of inmates that can be housed at CCJ without constituting cruel and inhumane treatment is 34 (36 if South Main 1 is used to house work release inmates).

Mr. Buchanan indicated that his conclusions were based upon a number of factors. He testified that the very limited floor space in the cells coupled with the fact that the inmates spend nearly 24 hours a day in the cells results in very close confinement with other prisoners. This condition can lead to severe physical and psychological consequences.[12] Mr. Buchanan further

---

**12.** Pls.' Ex. No. 20 demonstrates that during 1978–79 numerous suicides were attempted at

CCJ. Captain Hanson testified that during his

stated that his conclusions were based on the lack of supervision,[13] the lack of exercise, and the lack of adequate lighting.[14]

Captain Hanson, who was called by defendants, also testified at length about overcrowding. His testimony can be summarized in the following manner:

i.) In North Max. 3, South Max. 3, North Max. 2 and South Max. 2, it is cruel and inhumane to place more than 1 inmate in each of these cells;

ii.) In North Max. 1 and South Max. 1, it is cruel and inhumane to house over 3 inmates in these cells;

iii.) In the Trustee Cell, because there are windows, plenty of light, a private bathroom and the trustees are out of the cell 10–12 hours a day, it is not cruel and inhumane to house up to 6 inmates in this cell;

iv.) In C–1 and C–2, because these cells are not used for ordinary living, it is not cruel and inhumane to house up to 4 inmates if not for over 48 hours;

v.) In North Main 2, South Main 2 and North Main 1, it is cruel and inhumane to house more than 4 inmates in each of these cells;

vi.) In South Main 1, because the cell is used for work release inmates, it is not cruel and inhumane to house up to 6 inmates in this cell, but it is cruel and inhumane to house more than 4 inmates in this cell if the inmates confined there are not obtaining daily release of some kind;

vii.) In North Bas. 1, South Bas. 1, North Bas. 2 and South Bas. 2, it is cruel and inhumane to house more than 4 inmates in each of these cells;

viii.) The total number of inmates that can be housed at the CCJ without constituting cruel and inhumane treatment would be 48 (50 if South Main 1 is used for work release inmates). This number is exclusive of the capacities of C–1 and C–2.

Captain Hanson testified that his opinion on what is cruel and inhumane treatment is based upon several factors. First, he emphatically stressed the need for adequate ventilation.[15] Second, he was equally vigorous about the crucial need for a second exit in the event of a fire.[16] Third, he indicated that at least one hour per day of exercise for each inmate would greatly alleviate the inhumane conditions at the jail.[17] And fourth, he indicated there was a need for adequate lighting.[18]

### 3. *Diet* [19]

The inmates testified that their diet is heavy on starches and that they rarely re-

---

tenure only 1 suicide was attempted and it appeared to be only a faint hearted attempt.

Dr. Pecoraro also testified that he had expressed his concern to the sheriff regarding the cramped quarters, lack of ventilation and lack of exercise. He testified that the conditions at CCJ can lead to muscle atrophy and emotional stress. He stated he has treated inmates for stress and anxiety. Dr. Pecoraro noted that there are potential physical problems associated with overcrowding such as a risk of contagion and body lice infestations.

**13.** See Section on Staff Qualifications and Inmate Supervision, infra.

**14.** Although this is not technically an overcrowding issue, Mr. Buchanan was critical of the fact that the CCJ is physically unable to classify inmates according to their status, e. g., violent, non–violent, convicted, or pre–trial, in order to maintain segregation. The size of the jail dictates that except for those placed in the maximum security area on the second floor, the remainder of the inmates are blended together.

Captain Hanson indicated that when an inmate is admitted, he is first placed in C–1 or C–2 for purposes of reviewing his size, past record, age and vulnerability. After making such determinations, the inmate is placed in a cell with "compatible" inmates.

**15.** See Section on Heating, Cooling and Ventilation, supra.

**16.** See Section on Fire Protection, supra.

**17.** See Section on Recreation, supra.

**18.** See Section on Electrical System and Appliance Use, supra.

**19.** Mr. Buchanan did not testify regarding the adequacy of the diet, but he did object to the defendants' practice of serving all of the meals in the cells. He stated that this practice can lead to unsatisfactory health consequences such as the attraction of vermin. He argued that the inmates should be fed in a central dining hall.

ceive fresh fruits or vegetables. See test. Messrs. Lear, Hutchings and Guthrie.

The plaintiffs' expert, Dr. Norge Winifred Jerome, who is a professor of nutrition at the University of Kansas Medical School, was also critical of the fare offered to the inmates. Dr. Jerome toured the CCJ on April 25, 1980. She testified that the food preparation area and storage facilities were inadequate to supply a sufficient flow of fresh fruits and vegetables. She recognized on cross–examination that her opinion assumed that there were not daily deliveries of these commodities. In any event, she felt that the diet had too many highly processed canned foods and too little vitamin C.

She was also critical of the menu planning at CCJ. Dr. Jerome stated that she reviewed typed menus from 1979 and some handwritten ones from 1980. She felt that the typed menus reflected an effort to provide a well balanced nutritional diet. She stated that the hand written menus lacked technical style and management competence. Dr. Jerome was suspicious of the menus she was given to review because of the discrepancy between the menu for the April 25, 1980 noon meal and what she observed was actually served. The menu indicated beef, gravy, potatoes, bread, drink, cake. She stated that the inmates received hot dogs, buns, bread, mashed potatoes, mixed vegetables, and chocolate pudding. She was of the opinion that this meal was inadequate because it lacked vitamin C. Dr. Jerome noted that a vitamin C deficiency can lead to gum disease and scurvy.[20]

In general, Dr. Jerome characterized the food supplied at CCJ as "homestyle". She cited numerous deficiencies in such a diet. She noted that such diets are not only low in vitamin C, but they are also high in carbohydrates and low in fiber. She testified that such a diet can lead to obesity and to the "diseases of civilized society"–heart disease, hypertension and cancer.

Captain Hanson testified that the inmates receive a vitamin C fortified drink each morning with breakfast. He stated that the inmates get fresh fruit twice a week, but that most of the vegetables are canned. Further, he advanced his opinion that the food served at CCJ was of very good quality. Captain Hanson knew of no one having become sick from the food and he said that he rarely gets complaints about the food.

Dr. Pecoraro testified that he had not encountered any anemia in the inmates and that, in his opinion, the prisoners are served a very adequate diet.

### 4. Visitation and Telephone Policy

Each inmate is allowed one five–minute telephone call per week. See test. of Messrs. Lear and Hutchings. Some of the inmates testified that they have trouble with custody personnel if they try to make an evening telephone call. See test. of Messrs. Lear and Guthrie. Aside from this complaint, the inmates stated that they have no difficulty contacting their attorneys.

Mr. Jerald Kiser, Public Defender for Clay County, Missouri, testified that members of his staff are at CCJ every day. He stated that they are forced to use many different locations around the jail in an effort to achieve privacy. He testified that the CCJ staff does an excellent job in finding space for attorney–client conferences, but that the staff's efforts are limited by the physical capabilities of the building.

Mr. Buchanan severely criticized the adequacy of the visitation room. He was of the opinion that the room was inappropriate for inmates who present lower security risks. The only method of communication is via a telephone while looking through a plastic window. Mr. Hutchings found the system inadequate because he could talk to only one person at a time. Captain Hanson testified that as many as 7 inmates can be placed in the 4'5" × 11'8" room at the

---

**20.** On cross-examination, she rejected the suggestion that it would be adequate to supply vitamin C in pill form or in flavored drinks such as "Tang". She stated that ingestion of vitamin C from artificial sources was not recommended in nutritional circles.

same time. Mr. Buchanan was critical of the arrangement because it lacks privacy and prohibits "contact" visits. He stated that accepted standards for jail facilities recommend that inmates be permitted visits over a table not blocked by a physical barrier. He noted that the American Bar Association recommends that each pretrial detainee be permitted three one–hour visits a week. On cross–examination, Mr. Buchanan admitted that he did not see the visitation room in operation. He also testified that he did not think that the room could be physically altered to accommodate contact visitation.

Captain Hanson stated that his staff makes every effort to provide privacy for attorney–client visits. Further, he observed that the telephone intercoms, like regular telephones, do not require the user to raise his voice to be heard. He added that other space is available in the building for visits. He stated that 7 inmates in the room at one time is unsatisfactory, but that 4 to 5 is a reasonable number.

### 5. Medical Care

The delivery of health care services at CCJ is chiefly handled by a full–time licensed practical nurse, Linda Smith Soper, and by Dr. Stephen Pecoraro.

Nurse Soper testified that she provides first level medical care, screens those inmates who are in need of further treatment by a physician, and maintains the jail's medical records. She is also responsible for distributing the inmates' medications during meals and at bedtime.

Nurse Soper stated that she screens every inmate within 14 days of his admission to the CCJ. She indicated that her workload was such that she cannot process the inmates more quickly. Each inmate is given a medical history form to complete and Nurse Soper stated that if an individual fails to voluntarily fill out the form, she will personally fill it out. If an inmate asks to see her or obviously needs medical aid, then she sees the inmate immediately.

Nurse Soper carries a "pager" and is on call 24 hours a day. She stated that if there is an emergency and she can not be located, the staff at CCJ takes the inmate directly to a hospital emergency room. She informed the Court that she did not know of anyone who was deprived of medical care at CCJ.

Dr. Pecoraro has worked at the CCJ since approximately 1974. He testified that the inmates contact the nurse, who then decides whether to call him. He stated that he is also on call 24 hours a day. He is in frequent telephone contact with Nurse Soper.

The medical records for each inmate are kept in Dr. Pecoraro's, which is not located in the jail building. Dr. Pecoraro stated that no copies of the records are kept in the jail files. He testified that the records are complete and are not deficient from a medical standpoint. His records consist of the patient's name, age, complaint, vital signs, physical findings, the diagnosis and treatment, and any laboratory reports, including x–rays.

The inmates had few substantial complaints about the medical treatment they received at CCJ. Mr. Hutchings received TB and blood tests upon his admission at CCJ. Although he was given the medical history form, he did not fill it out. He testified that he had seen the doctor for his arthritis and was given medication for his condition throughout the period of his incarceration. He stated on cross–examination that he had no problems with the medical treatment he received at the Jail.

Mr. Guthrie testified that prior to his incarceration at CCJ, he was permanently handicapped by injuries he sustained in an automobile accident. He testified that upon his admission to the jail, he filled out the medical history form and was given blood and TB tests. He was seen by Dr. Pecoraro, who prescribed Valium for his condition. Mr. Guthrie said that he had developed a rash which he thought was caused by fungal growth in the shower in his cell and that the nurse was indifferent to his complaint.

Mr. Lear complained about the necessity that inmates contact a guard in order to see

the nurse. But on cross–examination, he conceded that he had received "pretty good medical care".

The mother of Michael Webb, a former inmate, testified that her son was admitted to the CCJ on November 30, 1979. She said that because her son has a seizure disorder, he must have daily doses of phenobarbital. She stated that she attempted to bring his medication to the jail but that she was turned away. The medication log for CCJ indicates that although Mr. Webb did not receive phenobarbital until December 4, 1979, and he received it every day thereafter until his transfer to a different correctional institution on December 13, 1980.[21] There was no evidence that Mr. Webb suffered any ill effects from this incident.

The strongest attack on the health care delivery system at CCJ came from Dr. Edward Twin. Dr. Twin visited the jail on May 10, 1980 and stated that he conducted a "review" of the health care system. His critique can be summarized as follows:

i.) The medical records he observed were "awful". He stated that they were composed primarily of the notes made by the nurse paraphrasing laboratory reports and the doctor's instructions. He criticized the absence of physical assessment or diagnosis. He stated that such "source oriented" record keeping is quite common even outside correctional institutions, but that the system at CCJ was a "poor example of a poor system". He indicated on cross-examination that he was unaware that the full medical reports were kept at the doctor's office. He stated that if this is the practice, it is not a good system. In his opinion, medical records should be where the patient is located. Dr. Twin rejected any suggestion that the inmates may be receiving care not indicated in the medical records.[22]

ii.) There is a lack of preventative medicine. He described the present system, in which patients are treated only after they complain about something, as "episodic". He stated that he was aware that the CCJ's system is no different than most health care systems in this respect. Dr. Twin added that in his opinion the lack of preventative medicine always leads to bad health care.

iii.) No follow up or continuity is apparent in the health care provided.

iv.) Dr. Twin described the medical screening as "minuscule". He testified that while he had no criticism of the medical history form filled out by the inmates, he commended a system—employed by other jails with which he is familiar—of "mini-physicals" performed upon admission. He noted that the guards at CCJ had all received training in cardio–pulmonary resuscitation, first aid, and medical screening.

v.) The nurse is underutilized. Dr. Twin felt that her duties could be greatly expanded. He admitted, however, that he had not spoken with her.

The remainder of Dr. Twin's substantive testimony reflected his approval of the fact that CCJ is visited weekly by a psychiatrist from the Tri–County Mental Health Center and that the jail uses a properly charted medication dispensing system. He observed that inmates receive dental care as the need arises.

Dr. Twin did acknowledge that the standards for medical care are different when inmates are confined for very short periods of time.

6. *Disciplinary Rules and Grievance Procedures*

Upon their admission to the jail, inmates are given a list of CCJ's rules and regulations. See test. of Messrs. Lear and Hutchings and of Captain Hanson. This list simply defines various offenses and sets forth the applicable sanctions, and affords the right to a hearing before the jail administrator and the accusing officer.[23] Captain

---

**21.** See Pls.' Ex. No. 15.

**22.** Nurse Soper recognized the deficiencies in the medical records and testified that she is working to improve them.

**23.** Pls.' Ex. No. 22 reads as follows:

An inmate incarcerated in the Clay County Jail must remember that he still retains certain rights and obligations. Among those basic ob-

Hanson indicated that the inmates have not as yet been given a written policy on any rights they may have if they are cited for infractions. Captain Hanson stated that his policy is to file a "major" complaint against an inmate in court so that the inmate will have legal representation. At the time of trial, Captain Hanson had not yet experienced an incident of sufficient magnitude warranting this procedure. He stated that he handles "small" offenses on a practical level and that he is not very concerned about them.

Mr. Hutchings also testified about the enforcement of disciplinary rules at CCJ. He said that on one occasion he was placed in isolation for 5 days because "a couple of ladies didn't like me". He testified that this occurred in January, 1980 and that he was given no hearing prior to being placed in isolation. He stated that he was deprived of television, radio and books for the entire period.

Mr. Buchanan testified that the CCJ should have formal disciplinary procedures. He recommended that upon an inmate's infraction of a rule a violation report should be completed and a copy given to the inmate. He stated that if a major problem arises, a formal hearing should be held before an impartial officer within 72 hours, and that the alleged offender should be formally segregated pending the hearing. Mr. Buchanan also stressed the importance of affording adequate notice to the inmates accused of violating the rules. He argued that an established procedure produces consistency and fair treatment.

Captain Hanson testified that the CCJ has no formal, written grievance policy, but that he is working on one. At present, he tours the facility twice a week and takes notes. The inmates may pass notes to the guards, who are supposed to place them in Captain Hanson's box. Captain Hanson indicated that he then arbitrates the inmates' complaints.

The inmates complained about the CCJ's lack of a formal grievance mechanism and about the manner in which their grievances are handled. See test. of Messrs. Lear and Hutchings. Mr. Lear was angry about the treatment he received after returning to the jail after spending the day on work release. He stated that the guard would strip search him and then leave the office door open on the way out so that women employees could observe Mr. Lear without his clothes. Mr. Hutchings complained that on one occasion he and his cellmates saw body lice on another prisoner in their cell. He said they shouted for the guards and when the guards arrived, all of the occupants of the cell were stripped naked, subjected to verbal abuse, and "everything" was removed from the cell. Mr. Hutchings said they had to remain naked for over 6 hours while all of the confiscated materials were cleaned. In addition, both Messrs. Lear and Hutchings complained of "shakedowns" that would consist of being stripped naked and handcuffed to a bar while everything in the cell was searched. Neither inmate indicated that they lost any of their personal property during these incidents. The inmates were also unhappy with the jail policy allowing them haircuts only if

ligations is the duty to adhere to the rules and regulations of the institution. These rules are formulated to insure the secure and orderly operation of the facility.

Violations of the established rules and regulations will be dealt with in the following manner:

1. For minor infractions of the rules and/or regulations–segregation without radio or television for a period of four to seven days.

2. For more serious offenses–segregation and loss of all privileges for a period of one but not more than three weeks.

3. Charges deemed to be of a serious nature will be fully investigated by the Jail Staff and if evidence warrants, the findings will be forwarded to the Prosecuting Attorney to determine if criminal charges will be filed.

An inmate has the right to a hearing before the Jail Administrator and the accusing officer. Both will be present before any action against the accused is taken. The Jail Administrator

they were going to appear in court before a jury.[24]

Mr. Buchanan strongly endorsed formal grievance procedures for inmates. He indicated that the common view is that such procedures have largely diffused prison unrest in recent years.

### 7. Staff Qualifications and Inmate Supervision

The level of staff training was commended by Mr. Buchanan. He testified that although the State of Missouri does not provide training for correctional officers, new employees at CCJ are given 40 hours of pre–service training and required to have 80 hours per year of continuing education. Mr. Buchanan stated that most jails the size of CCJ do not require this much training. He testified that he had heard no complaints about Captain Hanson and that, in his opinion, Captain Hanson was doing an adequate job.

Inmate supervision should be performed once every 30 minutes, according to Mr. Buchanan. He testified that some regular supervision is important not only for security purposes, but also to insure that no inmate is harmed. He observed that the facility is poorly designed in this respect because CCJ personnel must enter the cell block area to supervise the inmates. The arrangement makes the approach of a security officer known well in advance, so that any mischievious behavior can be hidden from the patrolling officer. Mr. Buchanan added that the CCJ's present design subject the officers to the danger of being grabbed by inmates through the bars of their cells.

Mr. Lear testified that jail employees operate on three shifts—day, evening and night. He stated that five or six employees were present during the day, three in the evening and three at night. He testified that the guards came around regularly during the day, but infrequently in the evenings and at night. He observed that the guards appeared at supper time (approximately 5:30 p. m.), at 9:00 p. m. for medication distribution, at midnight, and then not until 5:30–6:30 a. m. the following morning. Mr. Lear said that an inmate wishing to summon a guard at night has to make a lot of noise, thereby running the risk of being cited for causing a disturbance. Mr. Hutchings agreed, stating that to get assistance an inmate has to "scream [his] lungs out". Mr. Lear concluded that he would have felt safer had the guards come around more often at night. Nevertheless, Mr. Lear testified that he did not have any difficulties with the other inmates. He observed no fights and did not witness any assaults.

Captain Hanson testified that his deputies inspect the cell blocks every 30 minutes during the day and during the night.

### 8. Library Services

The library is located on the second floor in a room measuring 7' × 13'8". Captain Hanson testified that the inmates can use it every night.[25] He stated that they are brought to the library one cell at a time. He testified that the library collection is composed of books and magazines, but no newspapers because of the fire hazard. For the same reason, no newspapers are allowed in the jail at all. Apparently, no legal materials are available.

---

will be the final reviewing authority in all such matters.

24. Captain Hanson testified that he did not know of any inmate being forced to remain naked in his cell. He stated that it was his policy to give pajamas to the inmate occupants of a cell being cleaned.

Further, Captain Hanson argued that the shakedowns are a necessary security measure. He stated that they are usually performed during the day, but that one escape incident prompted a 4 a. m. search or shakedown.

Captain Hanson testified that he will not pay for haircuts if the inmates are only appearing before a judge. Mr. Kiser indicated that he thought that the haircut policy was only a minor problem.

25. Mr. Hutchings testified that he was not allowed out of his cell to go to the library. He stated that an inmate wanting a book was required to send for it.

### 9. *Inmates' Personal Property*

The evidence reflected isolated complaints of inmate property being lost or misplaced. But on the whole, there were no significant problems indicated. See test. of Messrs. Lear and Hutchings and Captain Hanson.

### 10. *Religion*

The only evidence on religious practices at CCJ indicated that although two ministers come by from time to time, there are no organized religious services. Nor are there special diets available to inmates with religious dietary restrictions. See test. of

Mr. Hutchings. Nothing in the record demonstrated that any inmate was subjected to any forced religious indoctrination.

## IV.

## CONCLUSIONS OF LAW

Initially, this Court takes note of the extensive notice afforded defendants regarding conditions at the CCJ. Numerous grand jury reports of the Seventh Judicial Circuit of the State of Missouri and official (correspondence) admitted into evidence quite lucidly condemn certain conditions at the jail. See, Pls.' Exs. Nos. 24, 25, 26, 27.[26]

---

**26.** While this Court recognizes their conclusory nature, the Grand Jury Reports provide significant insight into the extent of local recognition of the deteriorated conditions at CCJ. It is instructive to include some of the comments from the Reports.

The 1975 Grand Jury stated "[t]he one word best describing the jail conditions is 'deplorable'."

In 1976, the Grand Jury concluded as follows: The jail is totally inadequate for incarceration of people. It is dark and poorly ventilated. Precautionary measures should be established so that the possibility of disease and infection can be better controlled. A program is needed for the inmates so they may have the opportunity for activities to serve both the County and their own well-being. This facility is a disgrace to the entire County and *immediate* action should be taken to correct this problem. [Emphasis in original].

The 1977 Grand Jury found the jail to be "totally inadequate and that the conditions of the structure were deplorable. We do, however, commend those persons responsible for the work that is being accomplished under such conditions."

The 1978 *Grand Jury found the jail to be* relatively clean, but noted numerous deficiencies, in particular:

The most severe problem that we saw was the lack of adequate ventilation. Air was stale and unhealthy for human habitation. This problem exists because the windows had been sealed in 1975. Temperatures in the summer reportedly soar to over 120 degrees causing prisoners to go without clothing in order to cool themselves. The County should take immediate steps to solve this problem.

In 1979, the following pertinent remarks appeared in the Grand Jury's Report:

Past Grand Juries of Clay County have proclaimed the inadequacies of the Clay County jail to its citizenry. This Grand Jury is no exception. This Grand Jury does not con-

done criminal activity, and believes the judicial system operates effectively in this county. However, when criminal activity is punished by incarceration in the jail, the people involved should not then be subjected to having to live in an environment that can, at best, be described as almost 'inhumane conditions'.

The following items are but a few observations made during the jail visitation: 1. The building is basically beyond economic repair. 2. The cleaning of the facility leaves much to be desired. 3. Mold and fungus is visible. 4. Ventilation is almost non–existent. 5. Water pressure is sometimes low and plumbing is deficient. 6. Sanitation is lacking. A most dangerous situation exists due to the lack of ventilation and jail layout. A fire with considerable smoke could possibly lead to loss of life not only of prisoners, but to the staff of Clay County employees whose job it is to care for the inmates.

. . . Our county jail is a disgrace to a county that prides itself on being populated by 'good' people. The Grand Jury's sensitivities were overwhelmed by the injustices that are foisted off in the name of law and order upon a portion of our population. Prisoners are guaranteed protection from cruel and unusual punishment; however, our jail negates this right. The jail's inadequacy reflects on the patrons of Clay County.

. . . We feel this building is a fire trap. There are missing fire extinguishers, inadequate emergency exits, no smoke masks and air tanks for personnel to evacuate prisoners in case of a fire and a complete lack of emergency evacuation procedures. In addition, the building is a health hazard with reports that on occasion sewage has been found leaking into the kitchen from above. We found flammables stored openly in the boiler room, filth, fungus on walls, inadequate ventilation, wiring and lighting. The building design is inadequate to afford security for county personnel.

**1292**

But as pointed out at the outset of this opinion, this Court can only exercise its power of review regarding conditions that deprive the inmates of a constitutional guarantee. *See, Bell v. Wolfish, supra;* and *Burks v. Teasdale, supra.* Federal courts are without jurisdiction to delve into the realm of prison affairs on issues which do not rise to the level of a constitutional infringement. Nevertheless, as the Eighth Circuit has made clear, "if states or counties operate detention facilities, they must meet constitutional standards." *Campbell v. Cauthron, supra,* at p. 508. Further, a claim that financial restrictions have prevented improvements in jail conditions is not a defense to constitutional violations. "We cannot permit unconstitutional conditions to exist simply because prison officials cannot or will not spend the money necessary to fulfill constitutional requirements." *Id.; See also, Finney v. Arkansas Board of Correction,* 505 F.2d 194 (8th Cir. 1974).[27]

*THE PHYSICAL CONDITIONS AT CCJ*

Physical conditions of incarceration have long been held to be within the ambit of judicial review. *See, Finney v. Arkansas Board of Correction,* 505 F.2d 194 (8th Cir. 1974); *Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977); and *Laaman v. Helgemoe,* 437 F.Supp. 269, 308–09 (D.N.H.1977). Conditions which deprive prisoners of a tolerable living environment are not constitutionally permissible. *See, Owens–El v. Robinson,* 442 F.Supp. 1368, 1378–79 (W.D.Penn. 1978), *aff'd. and remanded on other grounds, sub. nom. Inmates of Allegheny City Jail v. Pierce, supra; Battle v. Anderson,* 447 F.Supp. 516 (E.D.Okl.1977), remanded, 594 F.2d 786 (10th Cir. 1979); and *Williams v. Edwards,* 547 F.2d 1206, 1214 (5th Cir. 1977).

> We, therefore, recommend immediate condemnation and closure of this facility. We recognize closure of the jail would present serious problems but the solution is not in our hands. However, a solution would be the erection of a new and adequate facility.

a. *The Plumbing System at CCJ*

In general, the evidence indicated that although the plumbing system at CCJ is quite old, it is structurally sound. To the extent that the plumbing system functions in the manner intended, it does not deprive inmates at CCJ of a tolerable living environment.

But the problem of the spillage of sewage–laden water during performance of the frequent repairs on the plumbing system and the resulting leakage of such material into the cells below does present an issue of constitutional proportions. This Court must and does find that defendants' failure to immediately evacuate inmates from any sewage–contaminated cell, pending a thorough cleaning of the affected cell, violates the constitutional rights of the inmates subjected to this condition. Ideally, it would be desirable to prevent such conditions from materializing in the first place; but unfortunately, the record indicates that the age and physical design of the plumbing system, as well as the age and physical design of the building, make this ideal unattainable. The spillage problem at CCJ as described in the record, clearly transgresses any notion of what constitutes "civilized standards, humanity, and decency." *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)); *see also, Campbell v. Cauthron, supra.*

With respect to the inmates' complaints about condensation of water vapor on cell walls following showers and about the lack of hot water after meal times, the Court finds that no constitutional violations have been proven. The evidence showed that the water condensation was immediately cleaned up and that the hot water shortage was only for limited times of the day.

27. For purposes of simplification, this Court's findings of unconstitutional conditions or practice are predicated upon violations of the Eighth Amendment for convicted inmates, and violations of the Fifth and Fourteenth Amendments for pretrial detainees, unless otherwise noted. See, *Campbell v. Cauthron, supra,* at pp. 504–505; and *Bell v. Wolfish, supra.*

### b. Electrical System and Appliance Use

Upon a careful review of the record, this Court finds that nothing of a constitutional nature was presented in the evidence relating to the electrical system or the appliance use. While the electrical system is undoubtedly old, the plaintiffs did not show this Court how any systemic deficiencies in the electrical system made the inmates' living conditions intolerable. Although the lights are left on all night and there is a high noise level at night, these are not *per se* unconstitutional conditions. All the evidence showed was limited testimony that these conditions resulted in difficulties in sleeping at *night*. The evidence also showed that the inmates sleep during the *day*. There was no evidence indicating that the inmates are unable to sleep at all or that they have developed psychological or physiological problems. *Cf., Rhem v. Malcolm,* 371 F.Supp. 594, 607–09 (S.D.N.Y. 1974), *aff'd.* 507 F.2d 333 (2nd Cir. 1974).

Further, the evidence showed that emergency lighting has been installed thereby correcting the problem of blackouts at the jail during power failures.

Whatever question there may be regarding the sufficiency of the lighting, it was so inadequately addressed in the record that this Court must conclude that plaintiffs have failed to demonstrate a constitutional deprivation.[28]

### c. The Heating, Cooling and Ventilation Systems

This Court finds no constitutional deficiencies in the heating or air conditioning systems at CCJ. The evidence shown to this Court did not reflect any severity of temperature inside the jail either in the winter or in the summer.

On the other hand, there is a most serious deficiency in the provision of adequate ventilation. Witnesses for both plaintiffs and defendants who testified on this subject concluded that the ventilation conditions at CCJ are entirely inadequate. Defendants' expert, Captain Hanson, called the conditions inhumane. On this record, this Court must find that the ventilation system at CCJ constitutes a constitutionally intolerable living condition. *See, Rhem v. Malcolm, supra,* 371 F.Supp. at 621; *Battle v. Anderson, supra,* 447 F.Supp. at 524; *Owens–El v. Robinson, supra,* 442 F.Supp. at 1378–79; *Lightfoot v. Walker,* 486 F.Supp. 504, 511 (S.D.Ill.1980).

### d. Fire Protection

While the record indicates that many positive improvements have been made, this Court observes that witnesses for both plaintiffs and defendants recognized serious deficiencies in the fire safety of the jail. Conditions that threaten inmates due to inadequate fire safety precautions have been found unconstitutional in many cases. *See, e. g., Laaman v. Helgemoe, supra,* 437 F.Supp. at 323; *Moore v. Janing,* 427 F.Supp. 567 (D.Neb.1976); *Gates v. Collier,* 349 F.Supp. 881, 888 (N.D. Miss.1972), *aff'd.* 501 F.2d 1291 (5th Cir. 1974). The unnecessary risk of tragedy stemming from the failure of defendants to correct the fire hazards at CCJ shocks the conscience of this Court. The deficiencies indicated in the record, including the lack of a fire escape, the absence of windows, the lack of necessary firedoors, and the limited number of fire extinguishers, amount to constitutionally intolerable conditions.

### e. Sanitary Conditions

On the whole, the evidence demonstrated that CCJ is a clean institution. Nothing was shown to this Court regarding a filth or vermin problem. *Compare, Finney v. Arkansas Board of Correction, supra; Lightfoot v. Walker,* 486 F.Supp. 504, 510 (S.D.Ill. 1980); and *Mitchell v. Untreiner,* 421 F.Supp. 886, 889 (N.D.Fla.1976).

## THE PRACTICES AND POLICIES AT CCJ

### a. Recreation

There was no disagreement between the experts for both plaintiffs and

---

**28.** Curiously, the inmates did not complain to any significant degree about the level of lighting; but Mr. Buchanan concluded it was inade-quate and Captain Hanson based his opinions on the cruel and inhumane nature of confinement at CCJ in part on the "lack of lighting".

defendants that in order to avoid inhumane conditions a minimum of one hour of exercise per day for each inmate outside the cell must be provided. This Court agrees, especially in light of the limited time the inmates spend outside their cells. It cannot be doubted that prisoners have the right to reasonable physical exercise. *See, Campbell v. Cauthron, supra,* at p. 507; *Mitchell v. Untreiner, supra,* 421 F.Supp. at 901; *Moore v. Janing, supra,* 427 F.Supp. at 575; and *Rhem v. Malcolm,* 371 F.Supp. at 627. As there was no dispute on the amount of daily exercise that would afford humane conditions and given that the one hour a day per inmate standard is consistent with judicial authority on this subject, this Court holds that defendants' failure to provide each inmate one hour per day of exercise outside the cells is a constitutionally intolerable condition.[29] *See, Campbell v. Cauthron, supra.*

### b. *Overcrowding*

Again, there was no dispute between the witnesses for plaintiffs and defendants that as a general matter CCJ is overcrowded. However, there was disagreement between the witnesses on the maximum number of inmates that could be housed within particular cells.

██ At this juncture, this Court observes that there are no *per se* tests for determining the minimum constitutionally permissible space allocations for inmates. Rather, the inquiry has traditionally focused upon all relevant factors composing the total living environment for the inmates at a particular institution. *See, Burks v. Walsh, supra,* 461 F.Supp. at 481; *Chapman v. Rhodes,* 434 F.Supp. 1007, 1019 (S.D.Ohio 1977); *Campbell v. McGruder,* 580 F.2d 521 (D.C.Cir.1978); and *Detainees of the Brooklyn House of Detention for Men v. Malcolm, supra.* Therefore, after a very careful review of the record, and upon consideration of, inter alia, the extremely small amount

of time the inmates spend outside their cells, the limited floor space, the lack of adequate exercise, the uncontradicted evidence of the adverse physical and psychological consequences of close confinement, the numerous attempted suicides, the absence of fire safety precautions, and the lack of adequate ventilation, this Court finds as follows:

1. Regarding the second floor at CCJ,

i.) In North Max. 3, South Max. 3, North Max. 2 and South Max. 2, it is constitutionally intolerable to house more than one inmate in each of these 78 square foot cells. This finding is supported by the testimony for both plaintiffs and defendants and is further warranted because of the dangerous nature of these maximum security inmates.

ii.) In North Max. 1 and South Max. 1, it is constitutionally intolerable to house more than three inmates in these 168 square foot cells.[30] While plaintiffs' expert testified that no more than two inmates should be housed in these cells, this Court notes that the approximately 56 square feet of space that this holding affords each inmate is not inconsistent with the case law, *see Campbell v. Cauthron, supra, Burks v. Teasdale, supra,* and *Battle v. Anderson, supra,* and comports with the testimony of defendants' witness. Also, the finding is necessary because of the dangerous nature of the inmates placed in these cells.

iii.) In C–1 and C–2, it is constitutionally intolerable to house more than two inmates in these 105 square foot cells; when these cells are used for temporary confinement, no more than four inmates may be housed in these cells with no single inmate spending more than 48 hours in these cells with more than one other inmate. This conclusion is supported by the opinions of both plaintiffs' and defendants' witnesses.

---

**29.** There was no attack by plaintiffs on the sufficiency of the exercise facilities at CCJ.

**30.** This figure includes the space consumed by the fixtures, i. e., the bunks, the dining table,

and 9 square feet for the shower. The actual *floor* space per inmate can not be determined from the record, but it is substantially less than the indicated figure.

iv.) In the Trustee Cell, it is constitutionally intolerable to house more than six trustee inmates in this 184 square foot cell. This Court notes that this cell is used primarily for sleeping purposes as the trustees are out of the cell most of the day. The cell has plenty of natural light and has an attached separate bathroom measuring 62 square feet. Further, this finding is supported by the witnesses for both plaintiffs and defendants. *See, Campbell v. Cauthron, supra,* at pp. 506–507.

2. Regarding the first or main floor at CCJ,

i.) In North Main 2, South Main 2 and North Main 1, it is constitutionally intolerable to house more than four inmates in these approximately 200 square foot cells.[31] Plaintiffs' expert felt that no more than two inmates should be housed in these cells, but such a result would clearly be outside the parameters of recent judicial authority. *See, Campbell v. Cauthron, supra,* and the cases cited therein. In reaching the foregoing conclusion, this Court notes that most of the inmates at CCJ are confined for relatively short periods of time.[32] As the Eighth Circuit has observed, "[i]n determining maximum occupancy, we consider that most inmates are confined in the jail for relatively short periods of time. Thus, the requirements are less stringent than they would be if this were a long–term facility." *Id.* at p. 507.

ii.) In South Main 1, it is constitutionally intolerable, for the reason expressed for the other cells on the main floor, to house more than four inmates in this approximately 200 square foot cell[33] unless this cell is used to house work release inmates who use the cell primarily for sleeping purposes, then no more than six inmates may be housed in this cell.

3. Regarding the basement floor at CCJ,

i.) In North Bas. 1, South Bas. 1, North Bas. 2 and South Bas. 2, it is constitutional-

ly intolerable to house more than four inmates in these approximately 200 square foot cells[34] (for the reasons expressed) for North Main 2, South Main 2 and North Main 1.

Plaintiffs' complaint seeks a program classifying the inmates, "according to age, prior record and type of offense" in order to avoid housing young first offenders with multiple offenders. While many courts have dealt with the issue, *see Rhem v. Malcolm, supra,* 371 F.Supp. at 624–25; *Mitchell v. Untreiner, supra,* 421 F.Supp. at 899; and *O'Bryan v. County of Saginaw, Mich.,* 437 F.Supp. 582 at 596, it is incumbent upon plaintiffs to demonstrate how a given classification system or the lack of one deprives a defined class of inmates of a constitutional guarantee. For instance, the court in *O'Bryan* noted:

> Where pretrial detainees and convicted persons are co–mingled in their cell assignments, the Constitutional common denominator must be the rights of the presumed innocent. Accordingly, a *showing* of a total picture of confinement which constitutes a deprivation of due process for the pretrial detainees and which cannot be remedied except by changes which will affect the convicted and detainees alike will necessitate relief for both groups. *Id.* at 437 F.Supp. at 596 [Emphasis supplied].

The only evidence before this Court is that some kind of classification occurs when an inmate is admitted to CCJ. Mr. Buchanan testified that classification systems are highly desirable. However, plaintiffs failed to show that the current system of classification violates any inmate's constitutional rights. There was no evidence of assaults, fights, sexual abuse or other harm to any inmate. In light of these circumstances, this Court must conclude that plaintiffs have failed to establish the unconstitutionality of CCJ's current classification system.

---

**31.** See Note 27, supra.

**32.** See, Stipulation # 6.

**33.** See Note 27, supra.

**34.** See Note 27, supra.

#### c. Diet

■ As a general proposition, jail diets must be adequate to meet the health needs of the inmates. *See, Campbell v. Cauthron, supra*, at p. 508; *Laaman v. Helgemoe, supra*, 437 F.Supp. at 309; *Ahrens v. Thomas*, 434 F.Supp. 873, 893–94 (W.D.Mo.1977), *aff'd as mod.*, 570 F.2d 286 (8th Cir. 1978); and *Mitchell v. Untreiner, supra*, 421 F.Supp. at 900–01. In reviewing the evidence on this issue, this Court concludes that while plaintiffs' expert criticized the vitamin C levels and the carbohydrate and fiber contents of the diet served at CCJ, there was no showing of constitutional deficiency. In reaching this conclusion, this Court notes the testimony of Dr. Pecoraro who has ultimate responsibility for the medical treatment of the inmates. His opinion, based on many years experience at CCJ, was that the diet provided is very adequate. Further, this Court observes that the inmates receive a vitamin C enriched drink with their breakfast, fresh fruit twice a week and that Captain Hanson receives few complaints about the food. On the whole, this record does not reflect the kinds of gross deficiencies that have been exhibited in other cases. *Compare, Mitchell v. Untreiner, supra*, 421 F.Supp. at 890; *Ahrens v. Thomas, supra*, 434 F.Supp. 893–94; and *Campbell v. Cauthron, supra* at p. 508.

#### d. Visitation and Telephone Policy

■ It has been long held that inmates have the First Amendment rights to communicate with friends and relatives by means of visits, correspondence and telephone calls. *See, Owens–El v. Robinson, supra*, 442 F.Supp. at 1386; *O'Bryan v. County of Saginaw, Mich.*, 437 F.Supp. 582, 598–99 (E.D.Mich.1977); *Mitchell v. Untreiner, supra*, 421 F.Supp. at 895, 901–02; and *see generally, Procunier v. Martinez, supra*. Of course, the foregoing right is subject to rational limitations in the face of legitimate security interests of the penal institution. *See, Bell v. Wolfish, supra*, 99 S.Ct. at 1880.

Here, plaintiffs have alleged in their complaint that defendants have violated the inmates' First Amendment rights through arbitrary telephone and visitation policies. Also, they have attacked the facilities at CCJ as being insufficient for visitation purposes.

Regarding the telephone policy at CCJ, the only evidence presented indicated that inmates are afforded one five minute call a week and that some inmates have had difficulties making evening phone calls. Further, there was no testimony that reflected any dissatisfaction with the five minute a week policy. On the basis of this record, this Court concludes that there was no showing made of an unconstitutional denial of access to the telephone. *See, O'Bryan v. County of Saginaw, Mich., supra*, 437 F.Supp. at 599.

Again, plaintiffs failed to show this Court how the current visitation policies have limited access to visitors. Indeed, this Court fails to find in the record exactly what the visitation policies are at CCJ, except that visitation occurs on the weekends, or how the policies have operated to deny access to visitors. Further, there was no indication that the inmates have been unable to gain access to their attorneys.

The chief thrust of plaintiffs' attack on the visitation issue seems to have been on the sufficiency of the facilities for visitation at CCJ. On this question, plaintiffs produced substantial testimony from their expert, Mr. Buchanan. Basically, he criticized the size of the room, the impossibility of contact visits and the lack of privacy in the visitation room.

■ While many courts have grappled with the issue, the more recent judicial authority holds that pretrial detainees have a right to reasonable visitation, but no right to contact visits. *See, Inmates of Allegheny City Jail v. Pierce, supra*, 612 F.2d at 758–60; *Jones v. Diamond*, 594 F.2d 997, 1013–14 (5th Cir. 1979); *Feeley v. Sampson*, 570 F.2d 364, 373 (1st Cir. 1978); and *see generally, Bell v. Wolfish, supra*. This is especially so in small facilities like CCJ. The restrictions inherent in the physical

structure of the visitation room are clearly rational in light of the different types at inmates housed of CCJ with the varying security risks that they pose. In *Bell v. Wolfish,* the Supreme Court observed that "even when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in light of the central objective of prison administration, safeguarding institutional security. *Id.* 99 S.Ct. at 1878. Here, CCJ's inability to afford contact visits to the inmates is not constitutionally impermissible.

As noted, no evidence was presented that demonstrated the actual functioning of the visitation room during visitation hours. As such, this Court must conclude that plaintiffs have failed to show this Court how the visitation practices have impinged on whatever privacy interests the inmates may have. *See, Inmates of Allegheny City Jail v. Pierce, supra,* 612 F.2d at 759. And, without some showing that inmates have been unable to meet with visitors because of the small capacity of the visitation room, this Court is unable to review the adequacy of the visitation room on the question of sufficient access.

### e. *Medical Care*

As this Court has recently noted in *Burks v. Teasdale, supra,* the Supreme Court has clearly declared the appropriate scope of review in prisoner medical treatment cases. *See, Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoners needs or by prison guards in intentionally denying or delaying access to medical treatment or intentionally interfering with the treatment once proscribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983. *Id.* at 104–05, 97 S.Ct. at 291.

This standard has been held to apply to pretrial detainees as well as convicted inmates. *See, Inmates of Allegheny City Jail v. Pierce, supra,* 612 F.2d at 762 (*but see* Judge Aldisert's dissent); and *generally Campbell v. Cauthron, supra,* at p. 505.

Further, as this Court observed in *Burks v. Teasdale, supra* :

> In class actions challenging systemic deficiencies in the delivery of medical services in prisons, it has been held that in order to show 'deliberate indifference' on an institutional basis, plaintiffs must demonstrate either '[a] series of incidents closely related in time . . . [which] . . . may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners' *or* that 'the medical facilities were so wholly inadequate for the prison population's needs that suffering would be inevitable.' *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2nd Cir. 1974); *see also, Todaro v. Ward,* 565 F.2d 48, 52 (2nd Cir. 1977); and Note, 13 Suffolk L.Rev. 603, 610–11.

In reviewing the record, this Court has several observations. First, there was no indication that Nurse Soper or Dr. Pecoraro failed to possess sufficient professional qualifications. Further, the custody staff had all received training in cardio–pulmonary resuscitation, first aid and medical screening.

Second, both Nurse Soper and Dr. Pecoraro are on call 24 hours a day and Dr. Pecoraro is in frequent telephone contact throughout the day with Nurse Soper.

Third, each inmate is given TB and blood tests upon admission and is required to fill out a medical history form. While the record indicates that substantial improvement could be made in the time delays between admission and the screening, there was uncontradicted evidence that any inmate who desires to see the nurse or is in need of medical attention will see the nurse immediately. If the nurse is unavailable, the staff will, if necessary, transfer an inmate in medical need to a hospital emergency room. The provision of immediate medical screening for all new admittees would be a large step towards implementing the desira-

ble practice of preventative medicine that plaintiffs' expert advocated. But in light of this record, this Court fails to find any deliberate indifference to serious medical needs in the screening process currently used at CCJ.

Fourth, the inmate testimony generally reflected no indifference to their serious medical needs. Only one minor incident was cited which demonstrated that a former inmate failed to receive a necessary drug for four or five days. The record revealed no adverse consequences stemming from this incident. In any event, standing alone, this incident would be insufficient to show any pattern of an institutional deliberate indifference to the serious medical needs of the inmates.

Fifth, the evidence established the need for improvements in the medical records system at the jail. But, in general, it appeared that proper medical records are being maintained by Dr. Pecoraro at his office. Nothing was shown to this Court that indicated the insufficiency of Dr. Pecoraro's records or that the location of the records posed any threat to the health of the inmates. *Compare, Burks v. Teadale, supra.*

And sixth, CCJ supplies both dental and psychiatric services to the inmates.

Taken together, and in light of the short term confinements at CCJ, this Court concludes that there was no showing of an institutionally based deliberate indifference to the serious medical needs of the prisoners at CCJ.

### f. *Disciplinary Rules and Grievance Procedures*

■■■ On the issue of the disciplinary procedures currently employed at CCJ, plaintiffs have challenged the constitutional sufficiency of the due process rights afforded the inmates. Assuming that the segregation penalty currently in use abridges constitutionally protected liberty or property interests, this Court must hold in light of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and its progeny, that defendants' current disciplinary proce-

dure is constitutionally defective. *See, Smith v. Sullivan*, 611 F.2d 1029, 1042 n. 5 (5th Cir. 1980); *Walker v. Hughes*, 558 F.2d 1247, 1250 (6th Cir. 1977); *Lock v. Jenkings*, 464 F.Supp. 541, 554 (N.D.Ind.1978); *Bono v. Saxbe*, 450 F.Supp. 934, 941–46 (E.D.Ill. 1978); *Owens–El v. Robinson, supra*, 442 F.Supp. at 1383; *see also, Jones v. Diamond*, 594 F.2d 997, 1021–22, 1030 (5th Cir. 1979).[35]

Plaintiffs are also seeking a formal procedure for the airing of inmate grievances. This Court observes that it has been held that "[n]othing in the Constitution of the United States requires that defendants establish a grievance procedure." *Id.* 437 F.Supp. at 601; *see also, U. S. ex rel. Wolfish v. Levi*, 439 F.Supp. 114, 163, *aff'd.*, 573 F.2d 118, *reversed on other grounds, Bell v. Wolfish, supra; but see, Laaman v. Helgemoe, supra*, 437 F.Supp. at 320; and *Taylor v. Perini*, 413 F.Supp. 189, 265 (N.D.Ohio 1976). Nevertheless, this Court commends the defendants for their decision to establish a more formal grievance procedure rather than relying upon the ad hoc system currently utilized. The benefits of adequate inmate grievance mechanisms were amply detailed by plaintiffs' expert, Mr. Buchanan.

### g. *Staff and Inmate Supervision*

This Court was presented with no evidence showing that the staff at CCJ was inadequately qualified. Instead, the evidence demonstrated that the preliminary and on–going training of the staff was of good quality. *Compare, Mitchell v. Untreiner, supra*, 421 F.Supp. at 901.

Plaintiffs focused their challenge on the adequacy of inmate supervision at CCJ. It is clear that "[prisoners have] . . . a right . . . to be reasonably protected from constant threat[s] of violence and sexual assault by his fellow inmates." *Jones v. Diamond, supra*, 594 F.2d at 1016 (quoting *Woodhous v. Commonwealth of Virginia*, 487 F.2d 889, 890 (4th Cir. 1973)). *See also, Holt v. Sarver*, 442 F.2d 304, 308 (8th Cir. 1971).

---

**35.** As noted in the findings, defendants indicated that a new disciplinary policy is being drafted. This Court has not been shown the new policy.

Here, the evidence showed no incidents of assaults, fights or sexual abuse. Each inmate who is on work release undergoes a thorough inspection for weapons or contraband on his return. Also, periodic unannounced shakedowns of the cells are conducted in an effort to uncover anything of a harmful nature. The question of adequate supervision at night produced contradictory evidence. But, in general, the record showed that inmates could summon assistance at night if it was needed. On the basis of this record, this Court has not been shown that the level or adequacy of supervision is inadequate to protect the inmates at CCJ.

h. *Library*

Plaintiffs have challenged the lack of reading matter at CCJ. The complaint alleges that defendants must provide "access to books, magazines, newspapers and law books in sufficient quantity and quality".

Turning first to access to non–legal materials, the evidence reflected seminal efforts to establish a library at the jail. The library is composed of a few books and magazines. No evidence was presented to show that CCJ maintains or enforces any censorship or distribution policies that restrict inmate access to non–legal materials from outside the jail, except for the rule banning newspapers. Plaintiffs submitted no authority for their theory that a state penal institution must constitutionally *provide* non–legal reading materials in sufficient quantity and quality. *See, Bell v. Wolfish, supra; Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Guajardo v. Estelle,* 580 F.2d 748 (5th Cir. 1978).

▮ But, there *is* a constitutional question inherent within the jail policy forbidding newspapers. The general rule that has evolved in recent years is that prisoners retain "those First Amendment rights not inconsistent with prison security, order or rehabilitation." *Id.* at 760. As the Supreme Court has noted, "[t]he fact of confinement as well as the *legitimate* goals and policies of the penal institution limit [the]

retained constitutional rights [of inmates]". *Bell v. Wolfish, supra,* 99 S.Ct. at 1877. [Emphasis supplied]. While this Court recognizes the perceived risk of a fire hazard in allowing the inmates access to newspapers, given that the prisoners currently enjoy access to books and magazines, the regulation does not appear to be legitimately related to the stated objective. In upholding the "publishers only" rule in *Bell v. Wolfish,* the Supreme Court noted that the regulation there was a *"rational* response by prison officials to an obvious security problem". *Id.* at 1880. [Emphasis supplied]. The defendants offered no other rationale for their complete ban on newspapers. *Compare, Lovern v. Cox,* 374 F.Supp. 32, 35 (W.D.Va.1974). Further, there are no "alternative means" of securing newspapers under defendants' blanket prohibition. As such, the regulation would not be a reasonable time, place or manner regulation especially for any inmate spending a substantial period of time at CCJ. *See, Bell v. Wolfish, supra,* 99 S.Ct. at 1881. Therefore, this Court concludes that defendants absolute denial of access to newspapers violates the inmates' First Amendment guarantees. *See, Guajardo v. Estelle, supra,* 580 F.2d at 760–62.

▮ Prisoners have a constitutional right of access to the courts. *See, Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). This right has been interpreted to require that "prison authorities ... assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498. *See also, Owens–El v. Robinson, supra,* 442 F.Supp. at 1386–87; *Mitchell v. Untreiner, supra,* 421 F.Supp. at 895–96, 902; *O'Bryan v. County of Saginaw, Mich., supra,* 437 F.Supp. at 600; and *Ahrens v. Thomas, supra,* 434 F.Supp. at 898. The record is unclear whether CCJ affords inmates access to adequate law libraries or adequate assistance of counsel from persons trained in the law. Apparently, no legal materials are maintained at the jail. Assuming that the inmates are without access to adequate legal material or assistance,

this Court would be required to find defendants' failure to provide such services inconsistent with the teaching of *Bounds v. Smith, supra,* and succeeding judicial authority.

### i. *Inmates' Personal Property*

The Court concludes that plaintiffs have failed to demonstrate any constitutional deficiency in defendants' practices relating to the personal property of the inmates.

### j. *Religion*

Plaintiffs' complaint seeks that "religious services following the preferences of the inmates be established". The evidence showed nothing more than the fact that two ministers of undisclosed religious preference visit the jail occasionally, that there are no organized services, and that no special diets are available for inmates with religious dietary restrictions. No witness testified that he was denied the right to practice his religion or that he was subjected to any forced religious indoctrination.

On the basis of this record, this Court must conclude that plaintiffs have failed to show that any inmate desiring to practice his religion has been thwarted by jail policy, *see, Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Jones v. Bradley,* 590 F.2d 294 (9th Cir. 1979), or that any inmate has been subjected to forced religious indoctrination. *See, Campbell v. Cauthron, supra.* Further, this Court is aware of no authority requiring state penal institutions to "establish" religious services. It has long been held that penal institutions must afford "reasonable opportunities . . . to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." *Cruz v. Beto, supra,* 405 U.S. at 322, 92 S.Ct. at 1081. In the absence of any demand for religious services, this Court has not been shown how CCJ is under any constitutional requirement to establish religious services.

### k. *Shakedown Policy*

Plaintiffs' complaint also raised a Fourth Amendment challenge to defend-

ants' policy of conducting periodic security shakedowns. In light of *Bell v. Wolfish, supra,* this Court finds no constitutional violations in defendants' policy.

### ORDER

Upon careful consideration of the issues presented in this action, it is hereby

*ORDERED* that, effective seven (7) days from the date of this Order, defendants are enjoined from housing inmates within the cells designated in the Opinion in numbers exceeding the constitutional maximum found for each cell; it is further,

*ORDERED* that defendants are directed to prepare a plan within thirty (30) days of the date of this Order that will, with reasonable dispatch, fully rectify those remaining conditions found to be unconstitutional. Upon circulation of said plan to opposing counsel and to this Court, a conference of counsel will be ordered. No other Order will issue at this time.

Jurisdiction is retained.